IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,377

STATE OF KANSAS,
*Appellee,*

v.

AWNTERIO DWAN LOWERY,
*Appellant.*

SYLLABUS BY THE COURT

1.

The standard of review for prosecutorial error is a two-step process in which an appellate court must first decide whether a prosecutorial act complained of falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If that error is found, the appellate court must next determine whether it prejudiced the defendant's due process rights to a fair trial, using the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict

2.

Defendants cannot circumvent the contemporaneous objection requirements of K.S.A. 60-404 by characterizing the appellate issue as prosecutorial error, rather than an evidentiary error. The caselaw exceptions allowing an issue to be heard for the first time on appeal to serve the ends of justice or to prevent a denial of a fundamental right are not

routinely applicable to circumvent the contemporaneous objection requirements of K.S.A. 60-404.

3.

A district court's ruling on a motion for new trial is reviewed for an abuse of discretion. Judicial discretion is abused if judicial action is either: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.

4.

A prosecutor should not comment on the credibility of the State's own witnesses. Nevertheless, prosecutors have wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence, including explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.

5.

A "golden rule" argument, which is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members, is generally improper because it encourages the jury to decide the case based on personal interest or bias rather than neutrality. Moreover, a prosecutor should not make statements intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.

6.

Although prosecutors enjoy wide latitude in crafting closing arguments, those arguments must remain consistent with and true to the evidence.

7.

K.S.A. 2017 Supp. 22-3208(7) provides that a defendant has the right to be present at a hearing conducted by the court to determine the merits of any motion.

8.

The invited error doctrine provides that a litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal.

9.

When a defendant claims that his or her statement to law enforcement officers was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntary. The essential inquiry in determining the voluntariness of a criminal defendant's inculpatory statement is whether, considering the totality of the circumstances, the statement was the product of the accused's free and independent will.

10.

As a rule, a jury should not be concerned with the ultimate disposition in a criminal case, and it is error to inform it of the sentence the accused is facing if convicted.

11.

When a trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury. It is error for the district court to allow evidence regarding a law enforcement officer's explanation of the law.

12.

When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.

13.

When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. Furthermore, there is no distinction between direct and circumstantial evidence in terms of probative value, and a conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.

14.

In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect is such that collectively they cannot be determined to be harmless. A defendant's right to a fair trial is violated when the combined errors affected the outcome of the trial.

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed October 5, 2018. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause, and *David L. Miller*, of the same office, was with him on the briefs for appellant.

4

*Rachel L. Pickering*, assistant solicitor general, argued the cause, and *Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

PER CURIAM: Awnterio Dwan Lowery appeals his jury trial convictions for the premeditated first-degree murder of Tiffany Davenport-Ray (Davenport-Ray), the attempted premeditated first-degree murder of Melvin Ray (Ray), criminal discharge of a firearm at an occupied dwelling, possession of cocaine, unlawful use of drug paraphernalia, and possession of marijuana. Lowery's homicide convictions emanated from a shooting between two vehicles travelling down Kansas Avenue in Topeka, Kansas, on the victims' wedding night. Lowery raises eight issues, none of which require a reversal of his convictions.

FACTUAL AND PROCEDURAL OVERVIEW

In the afternoon of May 24, 2014, Ray and Davenport-Ray were married at Faith Temple Church in Topeka, Kansas. A reception followed at the Topeka Performing Arts Center (TPAC), after which the couple met family and friends at the Elks Lodge. Around 1:30 a.m. the couple left the Elks Lodge to go to a restaurant to eat, accompanied by Terrance Smith, who was catching a ride to Ray's aunt's house. Ray drove a Dodge Charger; Davenport-Ray sat in the front passenger seat, and Smith was on the driver's side of the backseat. The shooting incident occurred enroute and was described differently by the trial witnesses.

According to Ray, while at a stop sign at 13th and Kansas, he noticed a sport utility vehicle (SUV) behind him. He did not recognize the SUV but was unconcerned because he assumed it was a rental car driven by an out-of-town wedding guest. Ray turned South onto Kansas Avenue, proceeded to the far right-hand lane, and crossed 17th Street when Davenport-Ray leaned her seat back and put her head on Ray's shoulder. As

5

he was leaned over talking to Davenport-Ray, Ray heard a window "explode." He hit his brakes, noticed the SUV next to his Charger, saw muzzle flash coming from the SUV's front passenger seat, and heard a rapid succession of gunshots. Ray took Davenport-Ray's pistol from the center console and returned fire into the SUV two to three times. After Ray shot back, the SUV lost control, swerved in front of the Charger, went onto the sidewalk, and crashed into a pole, albeit shots continued to come from the SUV even after the driver lost control. Ray turned onto 19th Street and asked if everyone was okay; however, Davenport-Ray did not respond. Because Davenport-Ray was shot and covered with blood, Ray drove to Stormont-Vail Hospital.

Ray explained that, at the hospital, he could not get the Charger's passenger side door open, so he pulled Davenport-Ray out of the driver's side. After going inside to get help, Ray told Smith to stay with Davenport-Ray and then left for an apartment complex where he thought a relative lived. In the meantime, Davenport-Ray died at the hospital from a deep graze gunshot wound that carried across her forehead.

Police apprehended Ray outside of the apartment complex and took him to the Topeka Law Enforcement Center (LEC) for questioning. Ray testified that he initially lied to the police about shooting back at the SUV because he is a felon and was not allowed to possess a firearm. Eventually, he admitted to returning fire and said he left the handgun in the Charger; the police did not find the weapon.

Smith's version of the shooting related that he noticed an SUV come from behind the Charger, on the left side, and as Smith tilted over to lay down in the back seat, glass hit him in the face as he heard a gunshot. He ducked down for cover and heard other gunshots coming from "[b]eside [him] on the side that [he] was on." Smith said that he did not fire a weapon and did not see anyone else fire from within the Charger.

6

The first "shots fired" 911 call was received at 1:43 a.m. Multiple gunshots fired in rapid succession drew police to the area. Officer Samuel Cartmill testified that when he arrived, he saw a person, later identified as Lowery, running west down 19th Street and heard the citizen that resided at 1900 South Kansas yell that the runner was the driver of the SUV. Officer Brandon Uhlrig also pursued Lowery, eventually catching him, but not before Lowery had thrown a bag containing cocaine, marijuana, and a lighter over the fence of a car dealership. Lowery was handcuffed and placed in a patrol car, where Officer Cartmill elicited Lowery's statement that he was the driver of the wrecked SUV.

Lowery was transported to the LEC and interviewed by Detective Scott Dickey who was joined during part of the interview by Sergeant Richard Volle. During the interview, Lowery again admitted driving the SUV and running away after he wrecked the SUV. He said the wreck was caused by another car trying to "swerve [him] off the lane." Lowery said there was only one passenger in the SUV, whose name was "Kevin." He did not know Kevin but had agreed to give him a ride. Lowery denied that anyone in the SUV was shooting and declared that he had no idea who shot the woman in the other vehicle. He said that because things happened so fast, he did not know what transpired after he wrecked the SUV.

The police were told that two men had run west from the wrecked SUV, although those persons were not apprehended on the date of the incident. A later tip related that the two men had run to Tashara Yeargin-Charles' residence. After receiving a grant of immunity, Yeargin-Charles testified at trial that Thomas Brown, Jr., also known as "T-Black," and Jermel Robbins, also known as "B.G.," came to her residence in the early morning hours of May 25, 2014. The Shunga Creek separated Yeargin-Charles' residence from the SUV crash site, and, although she denied it at trial, a law enforcement officer testified that Yeargin-Charles had reported that Brown and Robbins were soaking wet when they arrived at her residence.

7

Police also gathered physical evidence from both vehicles and from the surrounding area. The Charger was struck by bullets five to six times, and trajectory paths appeared to show a shot that went slightly from the back to the front of the Charger, one that went nearly straight across the passenger compartment, and one that went from the front to the back. Although the police did not find a weapon in the Charger, a .9 millimeter shell casing was found in the driver's seat.

The SUV had one bullet hole entering the passenger side rear door; however, no bullet was found. Both the rear and front passenger side windows were down, and the side curtain airbags were deployed. Two bullet holes in the passenger side front airbag had burn marks indicting that the rounds were fired from inside the vehicle after the airbag had deployed. Lowery's identification and debit cards were found in the SUV's center console, which also contained plastic baggies of cocaine. The back of the SUV contained a shopping bag from City Trends. A Springfield Armory .45 caliber weapon was retrieved from the floorboard of the SUV. The 13-round magazine contained 10 live rounds; 1 round was jammed in the breech of the weapon, indicating a spent cartridge had failed to eject. Investigators cleared the jam and test-fired the weapon four times. The handgun jammed each time, leading the Crime Scene Investigator (CSI) to opine that the weapon could only fire one round at a time. The CSI could not say whether that weapon had been fired on the date of Davenport-Ray's death.

A house located at 1911 South Kansas, just south of where the SUV wrecked, was struck by gunfire. The resident at that address testified that around 2 a.m., she heard gunshots, yelling, and a car crash. She felt something on her leg, which she thought were pieces of paint from her house. A bullet was found inside the house, and there was a bullet hole on the north side of the house, about 50 to 75 feet from the SUV, that was in a direct line from the bullet holes in the SUV's passenger side airbag.

Five .45 caliber casings were found at the crime scene, two in a nearby business driveway, two near the SUV, and one in the front passenger door of the SUV. A Forensic Toolmark and Firearm Examiner testified that all five casings were fired from the same .45 caliber firearm; however, they were not fired from the Springfield firearm found in the SUV.

A piece of latex glove was found in the SUV's rear passenger door handle, and Robbins could not be excluded as the source of the DNA profile found on that glove. The probability of randomly selecting an unrelated individual from the population with this DNA profile is 1 in 7.360 quintillion. Latex gloves were retrieved near a fence in a lot that was on the path the two males were reported to have run after the SUV crash. Brown could not be excluded as the source of the DNA profile found on one of these gloves. The probability of randomly selecting an unrelated individual from the population with this DNA profile is 1 in 1.737 quadrillion. Lowery could not be excluded as the source of a partial DNA profile consisting of one allele on one of the latex gloves, although Robbins and Brown were excluded. The probability of randomly selecting an unrelated individual from the population with this single allele is 1 in 4. Likewise, Lowery could not be excluded as the source, or one of the sources, of the DNA profile found on the following items (with corresponding probabilities):  a swab from the steering wheel airbag (1 in 1.2496 trillion); a ball cap found on the driver's side floorboard of the SUV (1 in 11.14 quintillion); a head scarf (do-rag) found in the glove box (1 in 28.81 quintillion); the Springfield handgun and magazine (1 in 12); a Samsung Touch cellular telephone found in the SUV (1 in 4); and the chain link fence on the escape path (1 in 2).

Ray testified that the only motive for the shooting that he could imagine was that he had heard that Lowery and Brown were related to Andre Baker, who had been killed in 2006. Ray's name had surfaced during that investigation, although he was never arrested or charged with killing Baker. Ray said he had known Robbins since Robbins

was a child. Robbins died from a gunshot wound less than three weeks after Davenport-Ray's murder.

Lowery's version of events was presented through his testimony at trial. He explained that, at the time of the events in question, he lived in Oklahoma but was in Topeka visiting family for Memorial Day. He had traveled to Topeka in an SUV his girlfriend had rented earlier in the week, arriving at his aunt's house in the early morning hours on Saturday, and then slept until that afternoon. Around 4 p.m., Lowery's friend Patesse Burns came to his aunt's house and the two took the SUV to Kansas City to shop at the clothing store City Trends and eat dinner. They returned to Topeka and arrived at Burns' residence at 8th and Western around 10:30 or 11 p.m., where Lowery watched television until approximately 12:30 a.m. As Lowery was leaving Burns' residence to go to his aunt's house, Brown called him and asked for a ride to 35th and Adams. Lowery picked up Brown and another man, who Lowery later learned was Robbins, about a block away at 8th and Taylor. At the time, Lowery did not know Robbins, who introduced himself as "Kev."

After picking up Brown and Robbins, Lowery was driving south on Kansas Avenue when he noticed a car, later identified as the Charger, in front of him at a stoplight at 17th and Kansas. Lowery did not recognize the Charger and did not know who was in it. As he approached the intersection, the stoplight turned green, and Lowery drove around the slow-driving Charger on the left. As he went around, a shot was fired at the SUV. Lowery ducked and tried to turn the vehicle to the left, but the SUV swerved right and hit the curb and the pole, and Lowery was knocked unconscious.

Lowery testified that he awoke afraid and panicked; his passengers were gone. He exited the SUV through the passenger window, hitting his head on the concrete outside. Seeing headlights that he assumed were from the Charger, Lowery said he ran toward the chain-link fence, jumped over it, and turned back onto 19th Street. When he heard an

engine revving toward him, he threw away the marijuana, crack, and lighter in his pocket. Shortly thereafter, the police arrested him. Lowery denied shooting at the Charger and said he did not know his passengers were going to start shooting.

Jake Sutton, the limousine driver from the Davenport-Ray wedding, testified for the defense. Sutton was waiting by his limousine at the church when he observed a visibly upset man come out of the church. The man was talking with a couple about a confrontation in the church, and Sutton heard the man say there was going to be a wedding and a funeral on the same day. He also heard the man say he could have his "boys" there. Sutton did not think the upset man was part of the wedding party, but Sutton saw a member of the wedding party, known as "Danger," respond to the upset man and tell him everything was good. Further, between the wedding and the reception, Sutton was driving the wedding party when he overheard a female passenger say that if someone shows up, there was going to be a fight. Sutton did not know who the female passenger was referring to. Although Sutton was concerned about the safety of the people at TPAC, he did not act on his concerns that night. The following day, when he heard the news about the shooting, he filed a police report.

A wedding guest, Geondra Powell, told a detective she was aware that there was an argument at the wedding and that people outside of the church were upset. Powell believed the two men involved in the disturbance were Lamont Taylor (one of Ray's groomsmen) and a man with the possible alias of "Dank." During the State's evidence, Sergeant Josh Klamm had testified that he was aware that an argument took place between "Danger," who he believed to be Lamont Taylor, and "Dank," who he believed to be Daniel Martin.

During his testimony, Lowery said that an iPhone found in the SUV belonged to him. In the State's rebuttal, Detective Patrick Ladd testified about evidence extracted from the iPhone and from a Samsung phone found in the SUV. An unrelated text from

11

the Samsung phone stated, "this T BLK. Call me later." Detective Ladd related several communications between Lowery's iPhone and the Samsung phone from May 24th and 25th. On May 24th, at 8:10 p.m., the Samsung phone called Lowery's iPhone. At 8:15 p.m., Lowery's iPhone received a text from the Samsung phone stating, "Man cuz don't spin me NEED ya right now." At 8:31 p.m., Lowery's iPhone texted back, "Wass [sic] good." At 8:32 p.m., the Samsung phone called Lowery's iPhone. At 8:32 p.m., the Samsung phone texted Lowery's iPhone, "Where you at?" At 8:42 p.m., Lowery's iPhone sent a text to the Samsung phone stating, "30 min." At 10:06 p.m., Lowery's iPhone called the Samsung phone. And at 10:27 p.m., 12:34 a.m., and 12:39 a.m., the Samsung phone called Lowery's iPhone.

Detective Ladd also testified regarding location history for Lowery's iPhone based on applications (apps) used. He explained that when a person accesses an iPhone app, the app determines your Global Positioning System (GPS) location. Without objection, the State entered exhibits showing 22 app locations between May 24th at 12:53 p.m. and May 25th at 12:26 a.m. This data showed a 70% confidence factor that Lowery's iPhone was located at 1208 Southwest Munson in Topeka, the address of the Faith Temple Church where Ray and Davenport-Ray were married, at 1:15 p.m. on May 24th. The confidence factor, or certainty level, was determined by software, and Detective Ladd did not know how it was calculated.

Detective Ladd additionally testified about Lowery's location based on cell phone tower data derived from text messages, voice calls, and SMS traffic from Lowery's iPhone. He explained that the cell phone towers at issue were each connected to three antennas. Each antenna covers a 120-degree radius of the tower and produced sector lines going out from the tower. The antennas in the Topeka area have a normal range of 40 to 60 miles. The State admitted exhibits that Detective Ladd testified showed Lowery's iPhone utilizing a cell phone tower sector at 12:21 a.m. that did not include the vicinity of 8th and Taylor or 8th and Western. The State additionally admitted exhibits through

12

Detective Ladd's testimony that showed Lowery's cell phone utilizing a cell phone tower sector covering the Elks Lodge each time the iPhone was utilized from 12:34 a.m. to 1:44 a.m. on May 25th. The cell phone tower sector utilized by Lowery's iPhone during this time also covered 19th and Kansas but did not cover the area of 8th and Taylor or 8th and Western.

In surrebuttal, Lowery called Burns who testified that she traveled to Kansas City with Lowery on May 24th. Burns testified that after returning from Kansas City, Lowery watched television at her residence and left around 10:30 p.m. to go to his aunt's house.

The jury found Lowery guilty as charged of premeditated first-degree murder, attempted premeditated first-degree murder, criminal discharge of a firearm, possession of cocaine, possession of marijuana, and unlawful use of drug paraphernalia. The district court imposed a hard 25 life sentence for Lowery's premeditated first-degree murder conviction and a 620 months' imprisonment term for the attempted first-degree murder conviction to run consecutive to the life sentence; the sentences on the remaining counts were imposed concurrently. Lowery timely appealed and this court has jurisdiction under K.S.A. 2017 Supp. 22-3601(b)(3) and (b)(4) (off-grid crime; maximum sentence of life imprisonment imposed).

PROSECUTORIAL ERROR

Lowery claims that his right to a fair trial was violated by numerous instances of prosecutorial error both during the trial and in closing arguments. He argues the prosecutor erred during the evidentiary portion of the trial by violating orders in limine and by making improper comments and gestures in front of the jury. The improper comments and gestures complaint was raised in his motion for new trial, which the district court denied. The other evidentiary claims were not the subject of a contemporaneous objection and are not preserved for our review. See K.S.A. 60-404. His

13

complaints about closing arguments are subject to review, even without an objection at trial. See *State v. Crawford*, 300 Kan. 740, 744, 334 P.3d 311 (2014).

*Standard of Review*

We refined the paradigm for reviewing claims of prosecutorial error (formerly known as prosecutorial misconduct) in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016).

> "In *Sherman* we recited the standard of review as a two-step process in which an appellate court must first decide whether a prosecutorial act complained of falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. 305 Kan. at 109. If that error is found, 'the appellate court must next determine whether [it] prejudiced the defendant's due process rights to a fair trial.' 305 Kan. at 109. And to do that, the court uses the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). 305 Kan. at 109. Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. *Sherman*, 305 Kan. at 109." *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017).

With respect to the claim of error in the district court's ruling on his motion for new trial, we review for an abuse of discretion. Judicial discretion is abused if judicial action is either:  (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Williams*, 303 Kan. 585, 595-96, 363 P.3d 1101 (2016).

*Analysis*

*Evidentiary Claims*

We begin with Lowery's claims of prosecutorial error based on violating the district court's orders in limine during trial. Lowery contends the prosecutor violated limine orders during the questioning of four of the State's witnesses: David Carroll, LeeAnn Carroll, Yeargin-Charles, and Sergeant Klamm.

Lowery's complaint about the direct examination of the Carrolls involves his pretrial motion in limine, granted by the district court, prohibiting the prosecutor from "mentioning, referring to, or attempt[ing] to elicit in any manner, any evidence of prior convictions of the Defendant or other K.S.A. 60-446, K.S.A. 60-447 and K.S.A. 60-455 evidence in the trial of this matter before a hearing is held outside the presence of the jury." Under K.S.A. 2017 Supp. 60-455, evidence of prior specific instances of a defendant committing a crime or civil wrong is inadmissible unless the State establishes that the evidence is relevant to a material fact—other than the defendant's propensity to commit a crime—and the district court employs the safeguard procedures outlined in *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006). Lowery claims the prosecutor elicited from the Carrolls evidence implicating Lowery in the commission of the crime of aggravated intimidation of a witness without first having the hearing mandated by the order in limine.

The Carrolls had lived in the vicinity of the shooting and were called to testify at trial about their observations during the event. But the prosecutor also questioned them about an unpleasant visit the couple received from a man and woman a couple of months after the shooting. Without objection, David Carroll testified that he was contacted by "people who know what was going on and some of the people who did it." He said the people who contacted him were "[o]f a larger association than [Mr. Carroll]." When

15

pressed by the prosecutor, David said the visitors were "Mr. Lowery's homeboys." He explained a male and a female came to his house and the male became violent with the female, which made it more difficult for the Carrolls to testify and which prompted their moving away from Topeka.

LeeAnn testified after her husband. At various times during her direct examination, the defense objected on the grounds of hearsay; ambiguous question; asked and answered; speculative, vague, and ambiguous; and leading and suggestive. The defense did not object on the ground that the State was violating K.S.A. 2017 Supp. 60-455, nor did the defense request a hearing outside the presence of the jury. Consequently, Lowery runs headlong into the obstacle constructed by this court's requirement that appellate review of a claimed violation of an order in limine is contingent upon defense counsel lodging a contemporaneous objection with the trial court that states the same objection grounds as is being asserted on appeal. That immutable rule is founded upon K.S.A. 60-404, which states:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence *timely interposed and so stated as to make clear the specific ground of objection*." (Emphasis added.)

In *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009)—published several years before Lowery's trial—we clarified that defendants cannot circumvent the contemporaneous objection requirements of K.S.A. 60-404 by characterizing the appellate issue as prosecutorial error, rather than an evidentiary error.

> "We disapprove of our previous decisions that have granted appellate review of a prosecutor's questions and a witness' answers to those questions during trial without objection by way of a prosecutorial misconduct claim. From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including

16

questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." 288 Kan. at 349.

See also *Love*, 305 Kan. at 729 ("Turning next to the actual question-and-answer exchanges Love claims constitute prosecutorial error, there is a fundamental defect in his argument—he failed to object to any of the testimony he now argues was improper."). Moreover, the contemporaneous objection rule is not satisfied by objecting on one ground at trial and arguing another ground on appeal. See *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009) ("In short, the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error.").

Lowery contends that we should not countenance the State's hiding behind a lack of objection to evade review of its repeated violation of the district court's order in limine. He argues that, instead, "[r]eview is necessary to serve the ends of justice." But since *King*, this court has held that "if an appellate court was to overlook the lack of an objection 'because it is necessary to serve the ends of justice or to prevent the denial of [a defendant's] right to a fair trial, these and other caselaw exceptions would soon swallow the general statutory rule' of K.S.A. 60-404. [Citations omitted.]" In short, the failure to lodge a contemporaneous objection means Lowery's allegation of prosecutorial error is not preserved for appellate review in this instance.

Lowery's other claim of prosecutorial error during trial asserts that the prosecutor improperly elicited gang affiliation evidence during the testimony of Yeargin-Charles and Sergeant Klamm. A week after the Carrolls testified, Lowery filed a second motion in limine to prohibit the State's introduction of evidence "leav[ing] the jury with the impression that the Defendant is related to, includ[ed] in, or a member of a 'street gang.'" In granting the motion, without defendant or his counsel present, the district court was

17

ambivalent about whether the order prohibited a witness referring to people by their nicknames or street names.

During their trial testimony, both Yeargin-Charles and Sergeant Klamm referred to Robbins and Brown by their street names. The defense did not object. "[T]his court has repeatedly held that if one party's motion in limine is granted to exclude the admission of certain evidence at trial but that party does not object to the admission of such evidence at trial, then the issue is not preserved for appeal." *State v. Fewell*, 286 Kan. 370, 391, 184 P.3d 903 (2008) (citing *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 [2003]).

On appeal, Lowery attempts to circumvent the contemporaneous objection rule by framing this issue as prosecutorial error and by highlighting that the ruling on the motion in limine was made outside of his presence. As explained above, repurposing an evidentiary issue as a prosecutorial error challenge to avoid the contemporaneous objection barricade is unavailing. Likewise, Lowery's absence when the district court granted his motion in limine is a non sequitur. Lowery knew the content of his own motion and knew the district court had granted that motion. If the prosecutor was eliciting evidence Lowery believed violated his motion, it was incumbent upon him to lodge an objection to preserve the claim. Again, we decline to review Lowery's claim of prosecutorial error with respect to the prosecutor's examination of Yeargin-Charles and Sergeant Klamm.

*Prosecutor's Improper Comments and Gestures*

In a motion for new trial, Lowery complained that the prosecutor, Daniel Dunbar, made improper comments and gestures during the trial that were seen and overheard by the jury. Specifically, Lowery claimed that Dunbar was observed by gallery members making nonverbal gestures during defense counsel's questioning of witnesses, including rolling his eyes, throwing his arms in the air, and making facial expressions to show his

18

opinion regarding questioning. In addition, Lowery alleged that Dunbar was heard by gallery members saying "time to put it to bed, Gary [defense counsel]" and calling defense counsel a "fucking idiot."

Defense counsel attached four supporting affidavits in the district court, although none of the affidavits were admitted at the hearing on the motion for new trial. Only one of the affiants, Deborah Conwell (Deborah), testified at the hearing. She is the wife of one of Lowery's defense attorneys, Gary Conwell (Conwell). Deborah testified that she observed a portion of the trial from the last row of the gallery, although it is unclear where she was seated in relation to the jury. She said she brought Dunbar's actions to Conwell's attention after the trial.

Those actions included Dunbar throwing his head back in what she assumed was a display of disgust and throwing his hands into the air at one point, as if to say "you gotta be kidding me." During the questioning of a defense witness, after Conwell gave Dunbar caselaw on an objection issue, Deborah heard and read Dunbar's lips say, "He's a fucking idiot," and she saw Dunbar point to Conwell. Deborah testified that this all took place in front of the jury and that her niece also overheard the "fucking idiot" statement. Deborah admitted that she did not know for certain that the jury heard the statement, but she opined, "Well, if I heard it, I would suppose they heard it." On cross examination, Deborah admitted that the judge and Conwell's cocounsel were present during what she considered Dunbar's "animated" courtroom behavior and that cocounsel brought Dunbar's "animation" to Conwell's attention.

Dunbar testified at the motion for new trial hearing and denied calling defense counsel a "fucking idiot." He thought Deborah was referring to Dunbar's comment to Todd Hiatt, another senior assistant district attorney, in which Dunbar stated, "I think he thinks I'm a fucking idiot." Dunbar stated he made this comment after receiving caselaw on a hearsay issue that the State and defense counsel had discussed at pretrial and that the

19

State assumed the defense had decided not to pursue. Dunbar testified that he did not think he made this comment in a voice loud enough for the jury to hear, but he acknowledged that apparently it was loud enough for Deborah to hear.

Hiatt's story was that Dunbar had said to Hiatt, "You think I'm a fucking idiot?" Hiatt denied that the comment was directed at Conwell. Both Dunbar and Hiatt testified their conversation took place by the swinging door in the courtroom, but the record does not indicate where this door is located in relation to the jury.

The district court denied the motion for new trial. The court noted that there was not only no contemporaneous objection to Dunbar's comments and gestures, but the defense did not object the day following any of the alleged behavior. Further, the district court found there was no evidence that the jurors saw or heard the gestures and comments to which Deborah had testified, and the court found it significant that it had not received any affidavits from any of the jurors regarding this issue. Ultimately, the court found "there's absolutely no evidence that there was any impact on jurors regarding any of those alleged actions."

Although Lowery presents this as a prosecutorial error issue, it also involves the new trial statute, K.S.A. 2017 Supp. 22-3501, which provides that a district court may grant a new trial to a defendant "if required in the interest of justice." Lowery's argument focuses on the district court's finding that there was no evidence that the jury heard Dunbar's comments. He asserts that the district court's finding is unreasonable, because if a spectator sitting in the last row of the gallery heard the comment, then surely the jury heard it. But Lowery is simply asking us to reweigh the evidence, and we decline that invitation because that is not our function. See *State v. Garza*, 295 Kan. 326, 335, 286 P.3d 554 (2012) (not the function of appellate court to serve as a finder of fact).

20

Lowery additionally argues Dunbar's gestures and comments were improper, unsworn opinions from the prosecutor about the credibility of witnesses. But as the district court pointed out, no objections were made at or around the time of the conduct which would have allowed the district court to cure or mitigate any prejudice caused by Dunbar's behavior. Consequently, we cannot find that the district court abused its discretion in denying Lowery's motion for a new trial based on the comments and gestures of the prosecutor.

*Prosecutorial Error in Closing Arguments*

Lowery contends that multiple comments of the prosecutor during closing arguments constitute prosecutorial error that denied him a fair trial. He complains about the prosecutor drawing improper analogies, violating limine orders, commenting on the credibility of witnesses, making a golden rule argument, and misstating evidence.

Beginning with the analogies, the prosecutor told the jury that the ultimate question in the case was "who shot first?" The prosecutor explained that if Ray shot first, then Lowery is not guilty of murder because the killing was in self-defense. But if the first shot came from Lowery's vehicle, he is guilty of everything. Then the prosecutor argued:

> "It's kind of like—well, let me back up. Mr. Conwell asked a number of witnesses at the end of his cross-examinations, well, what evidence do you have that my client fired a gun? What evidence do you have that they fired first? None. None. None. None. Well, if not one single witness has any evidence of that, how could his client be guilty? That's what he's doing. I don't know if he'll argue that or not, but that's what he's doing.

21

"Well, it's not like that, ladies and gentlemen. Each witness—it's more like a puzzle. Each witness brings a piece with them, and each piece is admitted through their testimony and other exhibits. Each piece is then put aside. The next witness brings their piece, and eventually, all the pieces come together. And I guess it's my job to put those pieces together and show you what had happened. So it's no one witness who would sit here and say this is what from start to finish, because there's only a few people that really know that, the Defendant being one of them, Melvin Ray being another, and Terrance Smith. So the puzzle analogy, I think, helps address what Mr. Conwell is trying to do with the witnesses.

"Now, the reality of this case, and like a lot of crimes, is they're not committed necessarily in broad daylight in front of a gallery. Most crimes—most criminals attempt or at least hope to commit their crimes in the cover of darkness in the absence of people. That's your best shot of getting away with it, right? That's just common sense. Don't do it with a lot of people around, don't do it in broad daylight, because then it's harder to argue that it didn't happen or that I didn't do it. But unfortunately, for this Defendant and many defendants, they didn't commit the perfect crime. They left little bits and pieces, little crumbs laying around that helps tell the story.

"Another analogy:  What we're trying to do here is kind of paint a picture of what happened May 25th. I wasn't there, and hopefully none of you were there. At least, that's what you told us. Defense counsel wasn't there and Judge wasn't there. Some of the witnesses were there, some of them weren't.

"So how do I paint a picture to you of what happened in those early morning hours? Well, in presenting a case in a criminal trial, oftentimes, we don't put on evidence and exhibits and it shows you the picture. We're not drawing a picture. What we really do is shade the areas around the picture, so when we get done shading, what is revealed to you is the picture of what's left[.]

"Like a flower:  Instead of me drawing a flower, what I do, through witnesses, is shade the areas around the flower so that when we're done shading, you will look at it, and you will say, that's a flower, and yet I've never drawn a flower. That's kind of how it

22

works when you're dealing with crimes committed in the cover of darkness and in the absence of witnesses. It's all the stuff around that tells you what happened in the crime, and that's what happened throughout this trial."

The prosecutor then went on to discuss the evidence presented at trial, during which he returns to the shading analogy on five occasions. For example, when discussing the evidence of rubber gloves, the prosecutor stated:

"Let's shade in a little bit more. . . . Rubber gloves. Holy mackerel, you've got rubber gloves. What were you doing? I'll tell you what they were doing. They were shooting up this car. They were using guns. They didn't want to leave evidence behind, and it didn't end the way they planned, but they sure planned it."

Lowery argues Dunbar's arguments are variations of the puzzle and picture analogies this court condemned in *Crawford* and *Sherman*. In *Crawford*, the prosecutor used a jigsaw puzzle with missing pieces analogy to discuss the reasonable doubt standard during voir dire and closing argument. The Court of Appeals held that the prosecutor had committed misconduct, but it was a harmless error. Before this court, the State did not seek review of the panel's holding of misconduct, so we did not directly rule on that issue. 300 Kan. at 750. But in determining harmlessness of the error, we observed as follows:

"[O]ther courts have found trial error when a prosecutor used the puzzle analogy, giving warning to prosecutors to avoid its use. *E.g., United States v. Pungitore*, 910 F.2d 1084, 1128 (3d Cir. 1990), *cert. denied* 500 U.S. 915 (1991); *People v. Katzenberger,*178 Cal. App. 4th 1260, 1264-68, 101 Cal. Rptr. 3d 122 (2009), *rev. denied* (2010); *Lord v. State,* 107 Nev. 28, 35, 806 P.2d 548 (1991); *People v. Wilds*, 141 App. Div. 2d 395, 398, 529 N.Y.S.2d 325 (1988); *State v. Johnson*, 158 Wash. App. 677, 685, 243 P.3d 936 (2010), *rev. denied* 171 Wash. 2d 1013 (2011).

". . . Crawford also asks us to consider *State v. Stevenson*, 297 Kan. 49, 54, 298 P.3d 303 (2013), as an additional authority issuing such a warning. The State counters that *Stevenson* undercuts Crawford's argument.

"In *Stevenson,* the prosecutor showed the jury a sign with the words 'Wheel of Fortune' printed on it but with one letter missing and pointed out that, although there was a letter missing, there was no reasonable doubt about which letter was needed to complete the title. *Stevenson,* 297 Kan. at 52. The *Stevenson* court found no misconduct under the circumstances because the prosecutor used the analogy to explain that the State had to prove its case beyond a reasonable doubt, not beyond *all* doubt, and because the exhibit demonstrated the concept because only one letter was missing from a well-known title; in essence, the solution to the puzzle was so obvious there was no room for doubt.

"In addition, we warned:

"'The prosecutor's comments in this case scuffed the line of misconduct without actually crossing it. Nevertheless, only a slight difference in wording would have resulted in error, and use of this analogy seems fraught with possibilities for stepping over the line of error. Especially troubling is the potential for quantifying reasonable doubt by discussing the difference between missing one letter as compared to more. Consequently, we discourage use of the "Wheel of Fortune" analogy.' *Stevenson,* 297 Kan. at 55.

"*We reiterate and emphasize this warning.* The prosecutor's argument in this case demonstrates how differences in wording can move us from a conclusion that a prosecutor scuffed the line of misconduct to a conclusion that a prosecutor crossed the line. In this case the prosecutor did not attempt to distinguish between having no doubt and having a reasonable doubt, a distinction emphasized in the caselaw relied on in *Stevenson.* 297 Kan. at 53. Furthermore, based on the prosecutor's descriptions in this case, neither the jury nor an appellate court can determine how much of the puzzle is left unfinished and how much guessing a juror is being asked to perform. We do not know how abstract the remaining image might be. While both analogies are dangerous attempts to quantify reasonable doubt, the argument in this case is so vague and

ambiguous it is misleading. Thus, contrary to the State's argument we do not see *Stevenson* as assisting its cause." (Emphasis added.) 300 Kan. at 754-55.

Lowery also points to *Sherman*, where this court applied its new two-step analysis for evaluating prosecutorial error claims to Sherman's claim that the prosecutor committed reversible error in utilizing a Mount Rushmore analogy to explain the beyond a reasonable doubt standard. This court recognized that during voir dire, the prosecutor repeatedly tried to discuss the reasonable doubt standard with prospective jurors through analogy. The district court blocked the prosecutor's efforts during voir dire but told the prosecutor, "'You can use that stuff in closing argument.'" 305 Kan. at 96. During the rebuttal portion of the State's closing argument, the prosecutor utilized a slide show presentation that showed a drawing of Mount Rushmore with Theodore Roosevelt's face removed. Above the drawing were the words, "'Do you have a REASONABLE DOUBT this is Mt. Rushmore??' Below the drawing were the words:  'Even though you can't see all four figures!!'" 305 Kan. at 96. The prosecutor argued to the jury:

> "'Didn't really get to talk to you about reasonable doubt too much. I'm going to show you one diagram though. Not all the gaps are going to be filled by the state in this case. Every case always has some gaps. And like the jury instructions said it's up to you to listen to the witnesses['] testimony and use your life experience and inferences as to what happened in this case.
>
> "'Do you have any reasonable doubt that's Mt. Rushmore? But there's a gap. You're allowed to fill in those gaps, folks.'" 305 Kan. at 96.

*Sherman* stated, "We agree, and the State concedes, that the Mount Rushmore analogy would be error if it occurred today because such analogies are outside the wide latitude we currently permit prosecutors." 305 Kan. at 115. *Sherman* discussed *Crawford* and reasoned:

25

"Like the jigsaw puzzle cases, the prosecutor's use of the Mount Rushmore image and the question, 'Do you have a REASONABLE DOUBT this is Mt. Rushmore??' equated the lack of reasonable doubt with a standard that unavoidably included the jury's prior personal knowledge concerning a recognizable landmark. Specifically, the prosecutor's statement, 'But there's a gap. You're allowed to fill in those gaps, folks,' improperly equated a juror's prior knowledge about the picture being displayed to his or her 'life experience.' Such *illustrations are inappropriate because they foster the illusion that the jurors already know the full picture of the case they are hearing and are simply looking for pieces of evidence to match it*. In fact, we insist that jurors have minimal to no prior knowledge of a case precisely to prevent them from seeking evidence to confirm a preconceived narrative and conclusion." (Emphasis added.) 305 Kan. at 116.

*Sherman* recognized that *Crawford* "reined in the use of jigsaw puzzle analogies." 305 Kan. at 117. Further, *Sherman* "emphasize[d] . . . that such analogies are improper and to be avoided." 305 Kan. at 117. But because a prosecutor must be evaluated based on the state of the law at the time of the trial, which took place in 2007 in Sherman's case, this court found no error. 305 Kan. at 117-18. This court reasoned that the prosecutor received express permission from the trial court to present this line of reasoning during closing arguments. Further, the prosecutor was attempting to demonstrate through analogy that the State's burden did not require it to present a case beyond all doubt. 305 Kan. at 117. Therefore, the prosecutor's conduct was akin to that in *Stevenson* and did not venture outside the wide latitude afforded prosecutors in 2007. 305 Kan. at 117-18.

Lowery argues the prosecutor's argument in his case is just another variation upon the puzzle and picture analogies this court condemned in *Crawford* and *Sherman*. Furthermore, he points out that the analogies were made on July 28, 2015, after this court issued its opinion in *Crawford* on September 19, 2014.

The State counters that *Crawford* and *Sherman* are distinguishable because, here, the prosecutor was not using the analogies to define or discuss the State's beyond-a-

26

reasonable-doubt burden of proof. Instead, the prosecutor was merely using the analogies to discuss defense counsel's continued questioning of State witnesses regarding whether they had evidence that Lowery shot a gun at Ray's car. In other words, the prosecutor was using the analogies to explain to the jury that they could convict based on circumstantial evidence; direct evidence is not required, as the defense was suggesting.

The State's argument has merit. *Crawford* discussed at length the "long line of cases in which [this court has] warned that efforts to define reasonable doubt often, perhaps inadvertently, lower the State's burden, lead the jurors into '"a hopeless thicket of redundant phrases and legalese,"' and '"obfuscate rather than assist the jury in the discharge of its duty."' [Citations omitted.]" 300 Kan. at 753-54. Further, the prosecutor in *Sherman* explicitly tied the Mount Rushmore analogy to the reasonable doubt standard. 305 Kan. at 116.

To the contrary, here, during the prosecutor's shading analogy, it used a picture of a flower, a recognizable image, to illustrate the viability of circumstantial evidence, i.e., "direct evidence is not always necessary in order to arrive at compelling and reasonable inferences." See 4 Lane, Goldstein Trial Technique § 23:99 (3d ed. 2015) ("Snow on the ground—Assume that when you go to sleep there is no snow on the ground, if the next morning when you wake up there is snow on the ground, that is strong circumstantial or indirect evidence of the fact that it snowed during the evening. You don't need an eyewitness who actually saw it snowing in order to come to that conclusion."). Consequently, we hold that, like in *Stevenson*, the prosecutor's comments "scuffed the line of [error] without actually crossing it." *Stevenson,* 297 Kan. at 55.

Next, Lowery argues that the prosecutor erred by violating orders in limine and continued his improper shading argument in arguing David Carroll was intimidated by Lowery's associates:

27

"And what did he tell you? He got a visit about a month later from a guy who claimed the Defendant was his homeboy from a bigger association than him, and that intimidated him.

"Now, if what the Defendant said on the stand or through his presentation of what happened, why wouldn't they flush out David Carroll, talk to law enforcement, tell them what happened, testify for us because we didn't do anything wrong? No. A friend of Mr. Lowery's goes over there, and as Mr. Carroll said, it was a very intimidating situation. More shading. Why would they want that? Because they don't want him testifying, because they don't know exactly what he saw. They want him silenced."

Additionally, Lowery points to the State revisiting this theme during its rebuttal:

"Now where we disagree is the interpretation of what this person who came to Mr. Carroll's house, of what their intentions were. It seemed pretty clear through his testimony that the intentions of this person, who Mr. Carroll says he really didn't know, his wife assumed he knew, because he managed so many properties in central Topeka and there was a lot of people that would come around, that she assumed he associated with—through being an apartment maintenance man.

"But anyway, Mr. Carroll said he was not an acquaintance or a friend, and he was very intimidated by this gentleman. And this gentleman told him—or Mr. Carroll believed this gentleman was part of a larger association than him, and that he was, in fact—did state that Mr. Lowery was his homeboy, and that he took this visit as one of an intimidating act on this person on behalf of the Defendant. But again, that's the interpretation of Mr. Carroll's testimony. You watched him. You heard how he testified. You saw how reluctant he was to give that information.

"And the same goes with Ms. Yeargin-Charles. Now she clearly did not want to testify, and yet, she was a safe house for two of the gentlemen after they fled the area. So she's friendly with them, and yet, she was clearly intimidated and did not want to testify about her knowledge of the events that took place that evening."

Lowery is correct that the record does not support the prosecutor's implicit argument that Yeargin-Charles was intimidated by Lowery. Yeargin-Charles stated at the ex parte hearing that Lowery never threatened her or sent anyone to intimidate her. She explained, "[I]t's the other people that I know that's been attacking me and everything. I know it's not [Lowery.]" Further, the district court ordered that Yeargin-Charles was not to testify regarding any threats or intimidation. Accordingly, that portion of the closing argument was erroneous because it violated the trial court's order in limine and because it was not supported by the evidence presented at trial. See *State v. Fisher*, 304 Kan. 242, 252, 373 P.3d 781 (2016) ("During closing argument, the prosecutor must confine his or her remarks to matters in evidence."); cf. *United States v. Rios*, 611 F.2d 1335, 1342-43 (10th Cir. 1979) (holding prejudicial error in closing argument in part because prosecutor drew an inference that defendant had threatened the safety of Prosecutor's crucial witnesses when there was no evidence linking the defendant to the threats).

But with respect to the prosecutor's arguments reciting the testimony of David Carroll, that testimony came into evidence without objection and was fair game for closing argument. Perhaps the prosecutor's suggested inferences to be drawn from that testimony could be open to attack on another front. See Gershman, Prosecutorial Misconduct § 11:5 (2d ed. 2017) ("A common prosecutorial tactic to inflame the jury is to insinuate that the defendant killed, threatened, or bribed potential witnesses."). But the defense did not obtain a district court ruling on whether the testimony violated the pretrial order in limine, and the midtrial order in limine was entered after the testimony was given. Consequently, Lowery's claim of prosecutorial error for violating the trial court's orders in limine is unavailing.

Next, Lowery argues the prosecutor repeatedly, and improperly, commented on Ray's credibility. Specifically, Lowery points to three different times that the prosecutor told the jury that Ray was not hiding anything:

29

- "[Ray's] had a past. He's been to prison, federal prison, for drugs. He told you that. He didn't have to. *He's not hiding anything. He's given it all to you, the good, the bad, the otherwise, because he didn't do anything wrong.*" (Emphasis added.)

- "But what did [Ray] say on the stand? What did he admit to? He was calling people to retaliate. He was pissed. Somebody just shot his wife, and for all he knew, killed his wife and shot at him. He wanted to retaliate. Is that unreasonable under those circumstances? Who wouldn't want to? Now perhaps he had a resource that other people don't have available to them, but that's what he wanted done at the moment, and he said good thing the cops got me before I got through there to anyone. That's what he told you. *He's not hiding anything at this point. He's got nothing to hide, ladies and gentleman.*" (Emphasis added.)

- "[Ray] told you, I mean, with that evidence, he could have said I fired once. There's one shell casing, there's one bullet hole. He said I fired it a couple times—two, three times, because again, [*Ray*] *is not hiding anything.*" (Emphasis added.)

"'A prosecutor should not comment on the credibility of his or her own witnesses.'" *State v. Knox*, 301 Kan. 671, 683, 347 P.3d 656 (2015) (quoting *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 6, 105 P.3d 1222 [2005]). Nevertheless, prosecutors "have wide latitude . . . to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses." *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009). At times, it is difficult to discern where to draw the line between a prosecutor personally

vouching for the credibility of a State's witness and a prosecutor pointing out the permissible factors for the jury to use in making its own assessment.

Lowery relies upon *Knox*, where this court held the prosecutor committed misconduct by stating that a State's witness was "'brutally honest on the stand'" and was "'on the stand telling you the truth.'" 301 Kan. 683. On the other hand, in *State v. Jackson*, No. 105,168, 2011 WL 5143060 (Kan. App. 2011) (unpublished opinion), a panel of the Court of Appeals held similar statements to those at issue here did not constitute improper commentary on the credibility of witnesses. There, the prosecutor argued that the victim "'came in here with nothing to hide.'" 2011 WL 5143060, at *1. The prosecutor then discussed the victim's testimony about his past wrongdoing of writing a bad check and prescription fraud and again argued, "'He's not trying to hide anything from you guys.'" 2011 WL 5143060, at *1. The Court of Appeals held the prosecutor "did not opine that [the victim] should be believed. He simply pointed out that there was significant evidence that could have a negative impact on the issue of [the victim's] credibility and that evidence was freely admitted by the witness." 2011 WL 5143060, at *2; see also *State v. Ortega*, 300 Kan. 761, 775-77, 335 P.3d 93 (2014) (holding prosecutor within the wide latitude of permissible conduct when asking, "'What reason do [State witnesses] have to lie to you?'"); *State v. Netherland*, 305 Kan. 167, 182, 379 P.3d 1117 (2016) ("[T]his court has rejected claims of improper vouching when a prosecutor responds to a defense attack on the reliability of State evidence by explaining to jurors what they should consider when making credibility determinations.").

Here, Ray's credibility was clearly disputed at trial. Although a close call, we discern that it was within the prosecutor's wide latitude to craft an argument explaining to the jury that the victim was not hiding information that would negatively impact on his credibility.

31

Next, Lowery complains that the prosecutor made "golden rule" arguments. First, the prosecutor invited the jury to imagine what the incident was like for Davenport-Ray: "A glorious day . . . and in two minutes, you're going to be, in essence, dead." Then, the prosecutor argued:

"Now mind you, this is a guy, according to the defense, that's about to unload on a car that comes by him. That's what they want you to believe. That's what you have to believe. That doesn't make any sense.

"[Ray] tells you, as that's happening, he doesn't know what Terrance is doing in the back. He's not paying attention to him. *It's his wedding night. He's with his bride. They're going to get something to eat. And then he hears a loud noise, glass breaking. Could you imagine being in the state of mind where he was and that happening? Think for yourself. What would be your reaction in that moment as you're driving, just having been married, having a great time, your bride leaning her head on your shoulder as you're going down the street and then you hear this loud noise? How long would it take for you to figure out your world is about to become unglued?*" (Emphasis added.)

"A 'golden rule' argument is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members." *State v. McHenry*, 276 Kan. 513, 523, 78 P.3d 403 (2003), *disapproved of on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). "'Golden rule' arguments are generally improper because they encourage the jury to decide the case based on personal interest or bias rather than neutrality." *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006). "A prosecutor should not make statements intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law." *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2004), *overruled on other grounds by State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016).

The prosecutor's arguments fit squarely within the definition of a "golden rule" argument. Telling the jury to "[t]hink for yourself. What would be your reaction," had no

32

purpose but to inflame the passions and prejudices of the jury and divert its attention from its duty. We find prosecutorial error on this issue.

Finally, Lowery argues that the prosecutor misstated what the DNA evidence showed. We agree. "'Prosecutors enjoy wide latitude in crafting closing arguments . . . [, but] a prosecutor's arguments must remain consistent with the evidence.'" *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017) (quoting *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 [2016]).

Lowery first points to Dunbar's statements regarding the Springfield weapon found in the SUV:

"1 in 12, that could be one of you. That's not how it works. . . . It's compared to the rest of the world's population. How many times do you expect to find that profile, right? So each time we went up to the world, because the world is an option at that point, there would be a 1 in 12 chance we'd pull the person's profile at that location.

. . . .

"Is the world an option here? No. There's three guys in the car, based on his own admission; that's the world we're comparing it to. There's not a fourth guy, fifth guy, seventh billionth guy. There's three options. We know that. The lab doesn't get to know how many people they want to compare it to. They just know the probability of seeing this profile at this particular allele, compared to the world, is not one in whatever that number is. But through our evidence, we narrowed that world down to three, and we can compare it to the other two guys, 'T-Black' and 'B.G.', or Thomas Brown, Junior and Jermel Robbins. And when that DNA was compared to those two, what? They were excluded. Not probably not them, it is not their DNA. It cannot be their DNA.

"Now the population is down to one, the Defendant. That's his DNA on the gun."

That argument was a gross mischaracterization of the testimony on probability from the State's DNA analyst. The analyst testified that the sample from the Springfield weapon contained a mixture of DNA from at least three individuals. Lowery could not be excluded as a contributor to the profile. The probability of randomly selecting an unrelated individual from the population who could not be excluded from the profile is 1 in 12. Brown and Robbins were excluded from the profile. But the probability that Lowery was one of the contributors was 1 in 12, not 1 in 1.

Moreover, the prosecutor's statements that the relevant population of contributors was three people misstated the DNA analyst's testimony on probabilities. The DNA analyst testified that the probability was like a lottery ticket. "If the lottery says you have a 1 in 4 chance of winning, that doesn't mean that you can play four lottery tickets and expect that one will be a winning ticket. It simply means that your chances of selecting a [winning] lottery ticket at random are 1 in 4." The defense attorney asked for further clarification, so the DNA analyst gave the example of birthdays: just because 365 people are in a room does not mean that someone in that room has a birthday of August 4th, even though the probability of having a birthday of August 4th is 1 in 365. The analyst explained further that when a probability is 1 in 2, that "means that if you randomly selected a person from the population of unrelated individuals, there's a 1 in 2 chance that they would be included in the limited amount of information . . . from that profile."

The State argues the prosecutor drew reasonable inferences from the DNA analyst's testimony. But the problem is that the prosecutor misstated and got completely wrong the testimony of the DNA analyst, thereby misleading the jury. See *State v. Corey*, 304 Kan. 721, 735-36, 374 P.3d 654 (2016) (holding prosecutor erred in stating "'actual scientific evidence'" placed defendant's DNA on the victim's body when DNA evidence showed defendant could not be excluded from the DNA profile and the estimated probability of randomly selecting an unrelated male from the general population with the same partial DNA profile was 1 in 9).

34

The prosecutor made the same egregious misstatement of probability with respect to the sample from the glove:

> "Again, 1 in 4, that's not a big probability; could be three of you in here. That's not how it works. Compared to the world, what is our world at this moment? Our [w]orld is three gentleman as our population. Well, let's compare it to the other two; not them. Not maybe not them, maybe probably not them, it is not their DNA. Therefore, it's the Defendant's. He's got DNA on a rubber glove."

In short, the prosecutor's significant misstatement of the evidence constituted prosecutorial error.

*Reversibility*

Lowery contends that prosecutorial error infests his entire case and requires reversal of his convictions. We have found prosecutorial error in misstating the evidence and violating a limine order with regard to Yeargin-Charles' testimony; in making golden rule arguments; and in misstating the DNA evidence.

Our next step is to determine whether those errors prejudiced Lowery's due process rights to a fair trial. In evaluating prejudice, this court uses the *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), harmless error test. In conducting the harmlessness analysis, this court

> "must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become

35

the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.'" *Sherman*, 305 Kan. at 111.

The State argues even if the prosecutor erred, any error was harmless. The State points out that although not required, Lowery did not object to any of the prosecutor's comments during closing argument. The State argues without citation that this indicates that defense counsel did not believe the comments were outside the wide latitude afforded prosecutors and thus the statements were not prejudicial. Nevertheless, this court has considered failure to object in determining whether an error is harmless. *State v. Mitchell*, 269 Kan. 349, 361, 7 P.3d 1135 (2000) ("[T]he prosecutor's remarks did not receive the 'imprimatur of the trial court,' as the remarks were never objected to by [the defendant]."); see also *State v. Bridges*, 297 Kan. 989, 1016, 306 P.3d 244 (2013) ("In determining whether prosecutorial misconduct was motivated by ill will, among the things we have considered are whether the conduct was deliberate or in apparent indifference to a court's ruling.").

The State then turns its attention to the strength of evidence against Lowery. Certainly, one could debate whether the evidence was overwhelming that Lowery committed premeditated first-degree murder, as opposed to felony murder. But there are factors that weigh in the State's favor. First, contrary to Lowery's argument, the errors he preserved for review comprise but a small portion of the trial which extended from July 13th to July 28th. Second, on three occasions during his argument, the prosecutor reminded the jury that statements of counsel were not evidence. For example, the prosecutor said that the jury "can only consider those things that actually were testified to by a witness, exhibits that were admitted . . . . Those are the things that you can consider in your deliberation process, and only those things." He also stated, "And if I say anything during this portion that you don't recall or you do not believe is accurate, as the Judge told you, disregard it." Likewise, the trial court instructed the jury that statements,

36

arguments, and remarks of counsel were not evidence and should be disregarded if not supported by the evidence.

On balance, then, we hold that the prosecutorial errors did not rise to the level of denying Lowery a fair trial and do not require reversal.

DEFENDANT'S RIGHT TO BE PRESENT AT EVERY CRITICAL TRIAL STAGE

Lowery argues his constitutional and statutory right to be present at every critical stage of his trial was violated when, in the absence of Lowery and his counsel, the district court held a hearing on Lowery's motion in limine and compelled a State witness to testify pursuant to a grant of immunity.

*Standard of Review*

"Appellate arguments on a defendant's right to be present at every critical stage of his or her criminal trial raise an issue of law over which this court exercises unlimited review." *State v. Verser*, 299 Kan. 776, 787, 326 P.3d 1046 (2014).

*Analysis*

This court recently set out the legal framework relevant to Lowery's challenge:

"A criminal defendant's right to be present at every critical stage of the proceedings is guaranteed by both the United States Constitution and Kansas statute. *State v. Bolze-Sann*, 302 Kan. 198, 215, 352 P.3d 511 (2015). The constitutional right 'emanates from the Sixth Amendment right to confront witnesses and from the right to due process guaranteed under the Fifth and Fourteenth Amendments.' [*State v.*] *Davis*, 284 Kan. [728,] 731[, 163 P.3d 1224 (2007)]. K.S.A. 2016 Supp. 22-3405(a) codifies the right and '"is analytically and functionally identical to the requirements under the

37

Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings."' *State v. Killings*, 301 Kan. 214, 241, 340 P.3d 1186 (2015) (quoting *State v. Engelhardt*, 280 Kan. 113, Syl. ¶ 2, 119 P.3d 1148 [2005]).

"A critical stage of the proceedings for the purposes of the right to be present encompasses '"any stage of the trial when the jury is in the courtroom or when the defendant's presence is essential to a fair and just determination of a substantial issue."' *Killings*, 301 Kan. at 241 (quoting *Engelhardt*, 280 Kan. 113, Syl. ¶ 2). In the latter scenario, '"[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."' *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985); see also *Davis*, 284 Kan. at 731-32 (defendant's right to be present when the district court has a conversation with a juror).

"But that right is not unqualified, and it does not exist when the defendant's '"presence would be useless, or the benefit but a shadow."' *Grayton v. Ercole*, 691 F.3d 165, 170 (2d Cir. 2012) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07, 54 S. Ct. 330, 78 L. Ed. 674 [1934]). In addition, K.S.A. 2016 Supp. 22-3208(7) provides defendants the 'right to be present at a hearing on any motion,' though this right might be greater in scope than the constitutional right to be present. *State v. Brownlee*, 302 Kan. 491, 507-08, 354 P.3d 525 (2015) (declining to address whether every motion hearing is critical stage of trial due to State's concession that defendant had right to attend hearing from which he was absent).

"This court has observed that the scope of the right to be present is

"'influenced by circumstances and context, *i.e.*, a defendant does not have a right to be present at proceedings before the court involving matters of law . . . , at remand proceedings, . . . and when excuses from jury service and deferrals were determined prior to when jurors were assigned to a particular case. [Citations omitted.]' *State v. Minski*, 252 Kan. 806, 815, 850 P.2d 809 (1993).

"As we have summarized the right, it extends to 'any stage of the criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure.' *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000).

"'In determining whether the right extends to a particular proceeding apart from the trial itself, the Supreme Court has looked to the function presence would serve in the proceeding at issue. In particular, the Court has examined whether or not exclusion of the defendant interfered with the defendant's opportunity to test the evidence introduced against him, and whether or not it otherwise affected his opportunity to defend himself at trial.' 6 LaFave, Israel, King & Kerr, Criminal Procedure § 24.2(a) (4th ed. 2015)." *State v. McDaniel*, 306 Kan. 595, 600-02, 395 P.3d 429 (2017).

This court has not addressed whether an immunity hearing is a critical stage of the proceedings at which the defendant must be present. Other courts have found that a defendant did not have a right to be present at an immunity hearing. See, e.g., *People v. Boehm*, 270 Cal. App. 2d 13, 20, 75 Cal. Rptr. 590 (Cal. Ct. App. 1969) (immunity hearing in no way affected defendant's substantial rights to fair trial; defendant has no voice in State's granting immunity to witness); see also *United States v. Braasch*, 505 F.2d 139, 146 (7th Cir. 1974) ("Since, as we have said, a defendant has no standing to contest the propriety of a grant of immunity, it follows that appellants had no right to be present at the immunity hearings nor any right to obtain the identity of Government witnesses by or through being furnished copies of the orders granting immunity."); *Shockley v. State*, 269 A.2d 778, 781 (Del. 1970) ("[T]he constitutional right given every citizen to be present at all stages of criminal prosecutions against him and to confront witnesses testifying in behalf of the State does not extend to an immunity hearing."); *Com. v. Clemente*, 452 Mass. 295, 318, 893 N.E.2d 19 (2008) ("A defendant has no right to be part of the process in which a witness's claim of a Fifth Amendment privilege is considered. The hearing is held for reasons totally independent of the proceeding against the defendant, and the privilege is that of the witness."); *Goff v. State*, 931 S.W.2d 537,

549 (Tex. Crim. App. 1996) (holding no right to be present even though defendant would have argued against grant of immunity to accomplice and only witness to actual crime; reasoning hearing on accomplice immunity was not a hearing in defendant's case and agreement was between accomplice and the State and did not involve defendant's rights).

But in this case, immunity was not the only topic of the hearing. The district court also discussed and ruled upon Lowery's midtrial motion in limine. As noted in the *McDaniel* quote above, K.S.A. 2017 Supp. 22-3208(7) provides that a defendant has the right to be present at a hearing on any motion:

> "Any hearing conducted by the court to determine the merits of any motion may be conducted by two-way electronic audio-video communication between the defendant and defendant's counsel in lieu of personal presence of the defendant and defendant's counsel in the courtroom in the discretion of the court. The defendant shall be informed of the defendant's right to be personally present in the courtroom during such hearing if the defendant so requests. Exercising the right to be present shall in no way prejudice the defendant."

Therefore, Lowery had a statutory right to be present under K.S.A. 2017 Supp. 22-3208(7). Contrary to the State's argument, the district court violated Lowery's statutory rights by conducting a hearing upon Lowery's motion without the presence of Lowery and his counsel. But cf. *State v. Brownlee*, 302 Kan. 491, 507-08, 354 P.3d 525 (2015) (declining to address whether every motion hearing is critical stage of trial due to State's concession that defendant had right to attend hearing from which he was absent). Lowery was precluded from arguing that his motion included a prohibition on referring to persons by their street names when the district court equivocated on that point.

We discern that we need not consider whether Lowery's absence from the hearing also violated his constitutional right to be present, because the error was harmless even under the constitutional harmless error standard. As discussed above, Lowery waived any

40

complaint he had about the witnesses' use of street names when he failed to object. He not only failed to object when Yeargin-Charles and Sergeant Klamm testified, he admitted in his own testimony, without objection, that he went by "Rabbit" and knew Brown as "T-Black." In short, any prejudice emanating from the use of street names during the trial was not the product of Lowery's absence from the motion hearing.

## AIDING AND ABETTING INSTRUCTION

Lowery argues the district court clearly erred in instructing the jury on the law of aiding and abetting without modifying the standard instruction. Specifically, he argues the district court needed to instruct the jury that the State does not prove premeditation by establishing that it was reasonably foreseeable that someone might die during the defendant's particular course of action. The challenged instruction that was given, based on PIK Crim. 4th 52.140 (2014 Supp.), stated:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime.

"The person is also responsible for any other crime committed in the carrying out or attempting to carry out the intended crime, if the person could *reasonably foresee* the other crime as a probable consequence of committing or attempting to commit the intended crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime." (Emphasis added.)

41

*Standard of Review*

> "[I]nstructional error issues are subject to a multistep analysis: (1) the reviewing court must determine whether it can or should review the issue; (2) the court then must decide whether there was any error at all by considering whether the instruction at issue was factually and legally appropriate; and (3) finally, if error is found, the court assesses whether the error requires reversal. *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 [2012]). For jury instruction issues raised for the first time on appeal, the court applies a clear error standard, i.e., the court will not disturb the conviction unless it is firmly convinced the jury would have reached a different verdict had the instructional error not occurred. See *Herbel*, 296 Kan. at 1121." *State v. Sayler*, 306 Kan. 1279, 1285, 404 P.3d 333 (2017).

*Invited Error*

Lowery concedes that he did not object to this instruction, notwithstanding that the district court provided the parties with four opportunities to object to its jury instructions. That failure to object is what triggers the clearly erroneous standard of review recited above.

But the State goes one step further, contending that review is precluded by the invited error doctrine because the instruction Lowery challenges is identical to the instruction Lowery proposed to the district court. See *State v. Angelo*, 287 Kan. 262, 280, 197 P.3d 337 (2008) ("A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal."). Lowery counters that the invited error doctrine does not apply in this case because the instructional error was of a constitutional dimension. Specifically, he claims the given instruction relieved the State of its duty under the Due Process Clause of the Fourteenth Amendment to prove every element of the charged crime beyond a reasonable doubt. For support in refuting invited error, he

cites to *Verser*, 299 Kan. at 784, and *State v. Hargrove*, 48 Kan. App. 2d 522, 293 P.3d 787 (2013).

In *Verser*, this court held the invited error doctrine is inapplicable when a constitutional error is structural. 299 Kan. at 784. Lowery, however, acknowledges that the error he claims is not within the narrow scope of structural error; he argues that it comes remarkably close. We have held the error Lowery challenges is subject to clear error review. See *State v. Overstreet*, 288 Kan. 1, 9-15, 200 P.3d 427 (2009). Lowery's attempt to fit his claim into the short list of constitutional errors constituting structural error is unavailing.

In *Hargrove*, trial counsel proposed a defective jury instruction on attempted aggravated burglary that did not include the elements of the underlying crime of theft, and then Hargrove challenged the instruction on appeal. The panel endeavored to review the tension between "remedying a trial mistake eroding a criminal defendant's fundamental rights and enforcing the invited error doctrine preventing a party from crying foul based on his or her deliberate manipulation of that trial process." 48 Kan. App. 2d at 528. Highly summarized, the panel noted a distinction between defense counsel's tactical decisions to request instructions and defense counsel's inadvertence in requesting constitutionally deficient instructions, noting the latter, if proven, would not be subject to the invited error rule. 48 Kan. App. 2d at 547. But the panel specifically rejected the notion that a silent record proves inadvertence. 48 Kan. App. 2d at 552.

Here, even under the *Hargrove* paradigm, Lowery is faced with a fatally silent record with respect to inadvertence. See *State v. Fleming*, 308 Kan. 689, 704-05, 423 P.3d 506 (2018) (holding that in the face of a silent record on trial counsel's inadvertence or trial strategy, the mere fact of raising a constitutional issue does not prevent application of the invited error doctrine).

In sum, we decline to review Lowery's challenge to the aiding and abetting jury instruction because he invited any error that may be present.

## VOLUNTARINESS OF DEFENDANT'S STATEMENTS TO LAW ENFORCEMENT

Lowery claims that his statements to law enforcement officers after his arrest were involuntary and should have been suppressed. The State brought the issue to the district court's attention by filing a *Jackson v. Denno* motion to determine the voluntariness and admissibility of Lowery's statements. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed 2d 908 (1964). The district court conducted a *Jackson v. Denno* hearing and issued a memorandum decision, in which the court found that Lowery's statements were freely and voluntarily made and held that the statements were admissible at trial.

*Standard of Review and Burden of Proof*

"When a trial court conducts a *Jackson v. Denno* hearing, determines a defendant's statements were freely, voluntarily, and knowingly given, and admits the statements into evidence at the trial, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard and reviews the ultimate legal conclusion drawn from those facts de novo. In doing so, an appellate court does not reweigh evidence or assess the credibility of the witnesses but will give deference to the trial court's findings of fact. *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 (2005)." *State v. Warledo*, 286 Kan. 927, 934-35, 190 P.3d 937 (2008).

"When a defendant claims his or her statement was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntary." *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

*Analysis*

"The primary consideration to be given to a criminal defendant's inculpatory statement is its voluntariness." *State v. Swindler*, 296 Kan. 670, 678, 294 P.3d 308 (2013); see also *Stone*, 291 Kan. at 21 ("The essential inquiry is whether the statement was the product of an accused's free and independent will."). This court considers the totality of the circumstances when determining whether a defendant's statements were voluntary. *Swindler*, 296 Kan. at 678. The nonexclusive list of factors considered include:

> "'(1) the accused's mental condition; (2) the duration and manner of the interrogation;
> (3) the ability of the accused on request to communicate with the outside world; (4) the
> accused's age, intellect, and background; (5) the fairness of the officers in conducting the
> interrogation; and (6) the accused's fluency with the English language. [Citations
> omitted.]
>
> . . . .
>
> "'"[T]hese factors are not to be weighed against one another . . . , with those
> favorable to a free and voluntary confession offsetting those tending to the contrary.
> Instead, the situation surrounding the giving of a confession may dissipate the import of
> an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even
> after analyzing such dilution, if any, a single factor or a combination of factors
> considered together may inevitably lead to a conclusion that under the totality of
> circumstances a suspect's will was overborne and the confession was not therefore a free
> and voluntary act." [Citations omitted.]' *State v. Gilliland*, 294 Kan. 519, 528-29, 276
> P.3d 165 (2012)." *State v. Davis*, 306 Kan. 400, 417, 394 P.3d 817 (2017).

See also *State v. Garcia*, 297 Kan. 182, 188, 301 P.3d 658 (2013) ("These factors, even if established as true, do not necessarily conclusively establish that the confession was involuntary.").

Lowery argues that there were two additional factors, based upon his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that impact the voluntariness analysis. Specifically, he asserts that he was given an incomplete *Miranda* warning and that he did not explicitly waive his *Miranda* rights. We start with a discussion of the *Miranda* challenges, followed by a discussion of each of the enumerated factors, before considering the totality of the circumstances.

For the first time on appeal, Lowery argues that his *Miranda* warning from Detective Dickey was incomplete because it did not inform him that he had the right to stop answering questions at any time and terminate the interview. Lowery does not argue that such a statement is an express requirement of *Miranda*, because it is not. Cf. *United States v. Crumpton*, 824 F.3d 593, 610-11 (6th Cir. 2016) ("*Miranda* . . . mandated that a suspect undergoing custodial interrogation be informed of four particular rights: (1) 'that he has a right to remain silent'; (2) 'that any statement he does make may be used as evidence against him'; (3) 'that he has a right to the presence of an attorney'; and (4) that the attorney may be 'either retained or appointed.' . . . We and other circuits have made clear that 'a defendant need not be informed of a right to stop questioning after it has begun.'"); Nissman and Hagen, Law of Confessions § 6:15 (2d ed. 2011) ("It is clear that the *Miranda* decision affords persons in custody the right to cut off questioning at any time. Some police officers have incorporated this into their litany of warnings, advising suspects that, 'you have the right to stop answering questions at any time.' This separate warning is not one of those specifically enumerated in the *Miranda* opinion. It is probably implicit in the warning, 'you have the right to remain silent.' Consequently, no court decision has required this extra warning, although some courts have approved it."); see also *State v. Brown*, 306 Kan. 1145, 1152, 401 P.3d 611 (2017) ("[N]o verbatim recitation or 'talismanic incantation' is required to satisfy the *Miranda* rule. . . . 'The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."' [Citation omitted.]").

Rather than arguing a violation of *Miranda*, Lowery contends that the failure to explicitly tell him that he had the right to stop answering questions should influence the determination of voluntariness. He points to *State v. Price*, 247 Kan. 100, 103-04, 795 P.2d 57 (1990), where this court denied a State's appeal from an order suppressing a defendant's confession, when the district court "'suppressed [a statement] as involuntarily made on the basis that the defendant was not advised that he may rescind his right to remain silent at any time and terminate the interview.'" There, the detective recited the *Miranda* warning to the defendant from memory. This court noted that the defendant was not told if he wanted an attorney one would be provided to him prior to questioning and also was not told that if he asked for an attorney questioning would stop. 247 Kan. at 102. *Price* stated:

"*Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), sets forth a bright line rule listing the procedural safeguards which must be followed in custodial interrogation before a statement thus obtained from a criminal defendant is, pursuant to the Fifth and Sixth Amendments, constitutionally admissible at trial:

"'[A defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Opportunity to exercise these rights must be afforded to him throughout the interrogation*. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' 384 U.S. at 479. (Emphasis supplied.)" *Price*, 247 Kan. at 101.

*Price* did not hold the italicized language must be included in a *Miranda* warning; however, *Price* discussed the "spirit of *Miranda*" shown in standard Kansas Bureau of Investigation (KBI) and Federal Bureau of Investigation (FBI) warnings which go "beyond the letter of the law." For example, the standard KBI warning discussed in the opinion included a statement, "'*You can decide at any time to exercise these rights and not answer any questions or make any statements.* '(Emphasis supplied.)" 247 Kan. at 102. In denying the State's appeal; however, the court noted other cases upholding *Miranda* warnings that "substantially complied" with *Miranda* guidelines. 247 Kan. at 103 (citing *State v. Meeks*, 205 Kan. 261, 469 P.2d 302 [1970]; *State v. Phinis*, 199 Kan. 472, 430 P.2d 251 [1967]). The warnings in *Meeks* did not explicitly tell the defendant he could decide at any time to exercise his rights. *Meeks*, 205 Kan. at 263. Further, *Price* denied the State's appeal of the district court's decision to suppress the defendant's confession after noting that a standard KBI warning was readily available but not used despite the lack of urgency in the case at issue, and the "defendant's age, intellect, and background were perhaps known or apparent to the trial court but are not indicated in the record on appeal." 247 Kan. at 103.

Lowery also relies on *United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978), where the 10th Circuit held, "Although there may be no express requirement to warn suspects of the right to terminate questioning, the government's failure to so warn is certainly an important factor to be considered in determining the voluntariness of any statements made." Based on *Price* and *DiGiacomo*, Lowery makes a valid point that the failure to advise a defendant that he or she has the right to stop answering questions at any time becomes part of the totality of the circumstances to be reviewed in the voluntariness calculus.

In the same vein, Lowery argues that the absence of an explicit *Miranda* rights waiver should be included in the analysis. The State counters by citing *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979), and *State v. Kirtdoll*, 281

Kan. 1138, 136 P.3d 417 (2006), for the proposition that an explicit oral or written waiver of *Miranda* rights is not required. *Butler* pointed out that *Miranda unequivocally* said that mere silence is not enough to establish a waiver of rights, but then said "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." 441 U.S. at 373. In *Kirtdoll*, this court held that, when faced with an implicit waiver of *Miranda* rights, the issue "can be virtually indistinguishable from the issue of whether the defendant's statement was voluntary." 281 Kan. at 1144. As the district court opined, the issue "has merged with whether defendant's statements to Detective Dickey were voluntary."

With respect to his mental condition, Lowery argues that the district court's findings—that he was "responsive" to questions and not impaired by a lack of sleep or possible head injury—were not supported by substantial competent evidence. Lowery points to various places in the record where Lowery or a law enforcement officer referred to Lowery being tired. He also argues that he had a head injury from the automobile accident; he complained about his head hurting before the interrogation, but he received no medical attention.

But the district court did not ignore the evidence that supported Lowery's position. Rather, the court considered:  that Lowery was knocked unconscious in the car accident; that Lowery complained about his injuries to a police officer when he first arrived at the LEC, his head was spinning when he was taken to the interview room to talk with Detective Dickey, and he complained of head and ankle injuries to the Shawnee County Department of Corrections once he was taken into custody; and that Lowery "did yawn repeatedly during the interview and complained of being tired particularly during the last several times that Detective Dickey reentered the interview room to continue questioning the defendant." On the other side, the district court simply found that such evidence did not overcome the other evidence, to-wit:  that Lowery did not mention a head injury to

49

the interrogating law enforcement officers; that Lowery continued to answer interrogation questions in a responsive manner; that Lowery told Detective Dickey that he had slept the night before and gotten "enough rest"; and that, from a viewing of the interrogation video, the district court did not observe that Lowery appeared to be under the influence of alcohol or drugs.

In short, Lowery invites this court to reweigh the evidence with regard to Lowery's mental state at the time of the interrogation. We decline that invitation. The district court had sufficient evidence upon which to base its determination that Lowery was not mentally impaired at the time he gave his statement to law enforcement.

With respect to the duration and manner of the interrogation, Lowery points out that he was in the interrogation room for seven hours and ten minutes, albeit the time he was actually being interrogated was about an hour and seven minutes. He was in a 9 feet by 9 feet interview room that contained a table and chairs, which Lowery contends imparts a coercive sense of isolation. The district court did not find the duration extensive, given the interrogation sessions were generally around 30 minutes each. It further found that the length of Lowery's placement in the interview room "was not designed to wear him down but instead so that the detectives could obtain basic information and conduct other interviews regarding the shooting that took place."

Lowery's situation appears analogous to that in *State v. Brown*, 285 Kan. 261, 173 P.3d 612 (2007), *overruled on other grounds by State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017). There, the defendant was 21 years old, appeared to possess reasonable intelligence, and had previous exposure to the justice system. He argued his statements to law enforcement were involuntary in part because he was held in an interview room and handcuffed to a table for nearly 12 hours and interviewed for nearly 5 hours. This court held the "length of Brown's confinement to the interrogation room, while handcuffed to a table for long periods of time, causes the issue of voluntariness to be close." 285 Kan.

50

272. Although there were legitimate reasons for delays to investigate the case, "the legitimacy of or justification for the delays does not erase the concern over whether the length of time of confinement in the interview room while handcuffed to the table was so excessive as to be coercive." 285 Kan. at 272-73. However, other circumstances weighed in favor of finding the duration and manner of the interview were not coercive: breaks were taken, Brown napped, and Brown was allowed to leave the room for short periods of time. 285 Kan. at 274. In this case, the length of detention and the length of the interview were shorter; Lowery was not handcuffed to the table; he was allowed to leave the room on two occasions to use the restroom; and, like in *Brown,* he appeared to nap when law enforcement was not in the room. In short, the manner and duration of the interrogation do not weigh against voluntariness.

Lowery does not make an argument that his age, intellect, and background impacted the voluntariness of his statements. He moves on to argue that the interrogating officers employed unfair techniques. He describes those as threatening Lowery with a 50-year sentence if he did not tell the truth; telling Lowery the District Attorney likes "cooperative people"; saying that telling the truth will get Lowery less time; describing all the things Lowery would miss out on the rest of his life sitting in prison; and telling Lowery that when the codefendant was caught, he would put the blame on Lowery. The district court characterized the interrogating officers as being fair in that: they told Lowery what he was going to be charged with and what his likely sentence would be; their purpose in questioning Lowery was to give him an opportunity to explain what happened and also to provide information on who else was in the SUV with him; and neither interrogating officer raised his voice, showed his weapon, or displayed an inappropriate demeanor during the interrogation. Contrary to Lowery's urging, we do not discern in this case the combination of factors that led us to find officer unfairness in *State v. Swanigan*, 279 Kan. 18, 36-39, 106 P.3d 39 (2005).

51

Next, Lowery argues that his requests to communicate with the outside world were denied twice. As the district court acknowledged, during the interrogation Lowery asked to make a telephone call and the officers told him he could make the call when he got to jail. Lowery points to a second request, although that one came within two minutes of the termination of the interrogation.

> "[R]efusing a request for outside contact is not per se coercive. 'While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation.'" *Brown*, 285 Kan. at 274.

In *Brown*, this court held the defendant's statement was voluntary even though the defendant's three requests to make a phone call were denied. 285 Kan. at 274, 278; see also *State v. Harris*, 279 Kan. 163, 168-69, 105 P.3d 1258 (2005) (rejecting claim that confession was involuntary because request to use the phone to call someone regarding an alibi was denied). Nevertheless, although not inherently coercive, it is a factor to consider under the totality of the circumstances.

Finally, Lowery makes no argument that the factor on English language fluency had any impact on voluntariness. The district court's finding that Lowery appeared to be fluent in the English language is supported by substantial competent evidence.

Turning to the totality of the circumstances, we hold that Lowery's statements to law enforcement were freely and voluntarily made. Although he did not receive a comprehensive explanation of his *Miranda* rights; he did not explicitly waive his *Miranda* rights; he had suffered injuries in a car crash prior to his interrogation; and he was denied an opportunity to make a telephone call, his free will was not overborn. Lowery's responses to the interrogator's questions—sometimes denying, sometimes evading, sometimes not answering—displayed an understanding of the interrogation

52

questions that belied the notion that his statements were not the product of his free and independent will. We affirm the district court's *Jackson v. Denno* ruling.

FAILURE TO REDACT EVIDENCE FROM DEFENDANT'S VIDEO-RECORDED STATEMENT

Lowery filed a motion to redact portions of the video recording of his interview with law enforcement officers. The district court granted the motion in part. Lowery complains that the partially redacted statement contained inadmissible evidence.

*Standard of Review*

The following standards of review are applicable to evidentiary issues on appeal:

"Appellate review of a trial court's decision to admit evidence is a two-step process. First, the appellate court determines whether the evidence is relevant. *State v. Phillips*, 295 Kan. 929, 947, 287 P.3d 245 (2012). Evidence is relevant if it has a 'tendency in reason to prove any material fact.' K.S.A. 60-401(b). 'Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish.' *Phillips*, 295 Kan. 929, Syl. ¶ 7. Relevant evidence is both: (1) material, *i.e.* the fact has a legitimate and effective bearing on the decision of the case and is in dispute; and (2) probative, *i.e.* has '"any tendency in reason to prove"' the fact. *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013). Materiality is reviewed de novo, while probativity is reviewed for abuse of discretion. 297 Kan. at 622.

"If the evidence is relevant, the court next applies the statutory provisions governing admission and exclusion of evidence. *Phillips*, 295 Kan. at 947. 'These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on the rule in question.' *State v. Hughes*, 286 Kan. 1010, 1020, 191 P.3d 268 (2008). Whether the probative value of otherwise relevant evidence outweighs its potential for undue prejudice is reviewed for abuse of discretion. See *Phillips*, 295 Kan. at 947; *State v. Wilson*, 295 Kan. 605, 621, 289 P.3d 1082 (2012).

"A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Huddleston*, 298 Kan. 941, 318 P.3d 140 (2014). But '[w]hen the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.' *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006)." *State v. Bowen*, 299 Kan. 339, 348-49, 323 P.3d 853 (2014).

To the extent Lowery's challenges involve the adequacy of the district court's legal basis for admitting evidence, our review is de novo. See *Elnicki*, 279 Kan. at 51 (applying a de novo standard of review to a challenge to law enforcement comments on a defendant's credibility made during an interrogation).

*Preservation*

Lowery argues this issue is preserved for review through a contemporaneous objection. In the district court, however, defense counsel stated at the motion hearing that the portions of the video Lowery was seeking to redact were listed in bold in Exhibit A to defense counsel's supplemental motion to suppress. Although his motion and the district court's ruling cite to the unredacted version of the interrogation, on appeal, Lowery cites to the redacted version of the interrogation; therefore, his citations are not keyed to district court rulings.

Regarding Lowery's assertion of *Elnicki* violations, the district court ordered each redaction defense counsel argued constituted an *Elnicki* violation in defense counsel's Exhibit A. At the hearing, defense counsel explained to the court that it should focus on the bolded portions of defense counsel's Exhibit A for the content the defense wanted redacted. Further, defense counsel's supplemental motion stated, "That attached hereto as Exhibit A and incorporated herein by reference are references to portions of Defendant's

interview with the Topeka Police Department which Defendant request[s] be redacted for the reasons stated on Exhibit A." For the first time on appeal, Lowery asserts three new alleged *Elnicki* violations that were not specifically argued to the district court. While Lowery asserts that the district court ruled all *Elnicki* violations must be redacted, the district court ruling was made in the context of the *Elnicki* violations specifically alleged by defense counsel in Exhibit A. Moreover, the district court's written order makes it clear that the statements Lowery now challenges on appeal were not ordered redacted by the district court. Consequently, we hold that the *Elnicki* violations alleged on appeal are not properly preserved for appellate review. See *State v. Robinson*, 306 Kan. 1012, 1028, 399 P.3d 194 (2017) ("'Generally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial.'"); *State v. Anthony*, 282 Kan. 201, 213-14, 145 P.3d 1 (2006) ("We do not regard an *Elnicki* issue as one we must address to serve the ends of justice or prevent a denial of fundamental rights. . . . Instead, we adhere to our general rule that a challenge to the admissibility of evidence will not be considered for the first time on appeal."). Furthermore, Lowery's argument that Detective Dickey kept up the *Elnicki* theme during his trial testimony is likewise not preserved for review because there was no contemporaneous objection to the testimony now challenged on appeal.

With regard to Lowery's assertions that the district court erred in failing to redact statements implying he had a criminal history, four of the five allegations raised on appeal were preserved with an objection below. We also consider preserved the claims that the district court failed to redact law enforcement statements regarding felony murder and asserting that Lowery was facing 50 years in prison for murder.

*Analysis*

Lowery objected to the following statements that were not redacted from the video recorded statement admitted into evidence at trial:

- "What do you think you are going to be doing when you turn 80 years old? Huh? . . . Well I can tell you what you will be doing when you are 80, getting out of prison. You are 30 man."

- "So at age 30, 50 years, that could be the rest of your life, man."

- "Loyalty goes out the window for a lot of people man when they are looking at 50 years."

- "Well the laws say if you are involved in this incident, you can be charged with it."

- "Do you understand the laws behind felony murder? If you and a group of people or you and another person are committing a felony, meaning the other car getting shot up, and someone dies during the course of that felony, everyone involved is guilty of felony murder. So this is either felony murder or self-defense. But you ain't telling me shit. I mean to me, self-defense sounds a hell of a lot better than felony murder."

In denying Lowery's request to redact these statements, the district court relied upon *Harris*, where this court held it was proper for a detective conducting an interrogation to explain the difference between premeditated murder and felony murder and inform the defendant about the potential sentencing difference between the two crimes. 279 Kan. at 172. But as Lowery points out, the issue in *Harris*, whether the defendant's statements were voluntary, is distinguishable. Lowery does not argue the challenged statements rendered his confession involuntary; instead, he argues the jury should not have heard law enforcement officers' explanations of the law and potential penalties.

This court has held that "[a]s a rule, juries should not consider the ultimate disposition of the case." *State v. Yardley*, 267 Kan. 37, 42, 978 P.2d 886 (1999); see PIK Crim. 4th 50.080 (2015 Supp.) ("Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is not to be considered in arriving at your verdict."); PIK Crim. 4th 50.090 (2015 Supp.) ("Your only concern, at this time, is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is not to be considered in arriving at your verdict."). Therefore, in arriving at a verdict in the guilt stage of the trial, the jury should not have been concerned with the potential penalty for first-degree murder. Cf. *State v. Mattox*, 305 Kan. 1015, 1019-20, 390 P.3d 514 (2017) (holding Sixth Amendment right to jury trial violated when district court imposed a hard-50 sentence without fact-finding by a jury).

The State argues that, while it is improper for the jury to consider sentencing when deliberating, *Yardley* does not stand for the proposition that the jury cannot hear a law enforcement officer inform the defendant about the possible charges or sentence when interviewing the defendant in order to establish the severity of the crimes. The State contends that the manner in which the jury hears the information is the key; here, the prosecutor was not arguing for the imposition of a particular sentence. Rather, this was a relevant discussion between a defendant and law enforcement to show that law enforcement was not hiding information from Lowery about the seriousness of the charges. While creative, the State's argument is unavailing. The jury should not have heard the information about the possible sentence that would be imposed if it found the defendant guilty. The district court erred in refusing to redact that portion of the interview.

With respect to the law enforcement officers explanation of the law on felony murder, Lowery argues those statements were irrelevant because it is the sole province of the trial court to instruct the jury on the law. That argument has statutory support at

57

K.S.A. 22-3403(3): "When the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury." See also PIK Crim. 4th 50.040 ("It is my duty to instruct you in the law that applies to this case, and it is your duty to consider and follow all of the instructions. You must decide the case by applying these instructions to the facts as you find them.").

Moreover, the jury in this case was not presented with a felony murder prosecution. They were instructed on premeditated first-degree murder. The law on felony murder was irrelevant to this prosecution and could only serve to confuse the jury. It was error to leave that information in the jury's version of Lowery's law enforcement interview.

Turning to the statements implying Lowery had a criminal history, the statements to which Lowery objected are:

- ". . . put that swab into a computer, tells us who you are . . . ."

- "[Prison is] not a real enjoyable lifestyle, is it?"

- "What do you like to do, other than go to prison?"

- In a discussion about Lowery's tattoo representing deceased family members, "Q: [Volle] How many of them [passed away] violently? . . . A: [Lowery] One."

Lowery argues the first statement implies that his DNA is already in a law enforcement computer, which implies a criminal record. Lowery argues all the statements are impermissible under K.S.A. 60-421 and K.S.A. 2017 Supp. 60-455. K.S.A. 60-421 provides,

58

"If the witness be the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility."

K.S.A. 2017 Supp. 60-455(a) provides "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." Lowery argues the statements above implied he had a criminal record or committed prior bad acts and therefore were inadmissible under K.S.A. 60-421 and K.S.A. 2017 Supp. 60-455.

Relying on *State v. Smith*, 28 Kan. App. 2d 56, 62, 11 P.3d 520 (2000), Lowery argues, "The implication that a defendant committed crimes in the past is improper because it unfairly prejudices the jury against the defendant." In *Smith*, the Court of Appeals held the district court erred in allowing the State to imply that the defendant had a criminal history. 28 Kan. App. 2d at 62. Here, the implication in the second and third statements would have been obvious to the jurors, and it was error for the district court to refuse to redact those statements. While the first statement is not as glaring, we note that it also implies a criminal history.

With regard to the last alleged error set out above, the implication is far from obvious, and Lowery's brief makes no attempt to explain how this questioning implied he had a criminal record or committed a prior bad act. "A point raised incidentally in a brief and not argued there is deemed abandoned." *State v. Holman,* 295 Kan. 116, 142, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304, Kan. 773, 375 P.3d 332 (2016).

*Harmless Error*

The State contends that any failure of the district court to redact improper statements in the video recording of Lowery's law enforcement interview was harmless error. The State argues that the strength of circumstantial evidence supporting premeditation renders reversal inappropriate. But as will be discussed below in addressing Lowery's sufficiency of the evidence issue, we do not perceive the evidence of premeditation to be overwhelming. Nevertheless, the jury was instructed that it was not to consider the ultimate disposition in this case and we presume that the jury followed the instructions given. See, e.g., *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012) ("[W]e presume the jury follows the instructions given.). Further, in context, we discern that the redaction errors "did not affect [Lowery's] substantial rights, meaning [they] . . . did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

## HEARSAY EVIDENCE BEYOND THE SCOPE OF DIRECT EXAMINATION

Lowery argues that the district court erred in admitting the testimony from Detective Ky Shorb regarding the ownership of the Samsung cell phone found in the SUV, because the prosecutor's questions were beyond the scope of defense counsel's direct examination and elicited hearsay testimony from the witness.

*Standard of Review*

"'When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.'" *Bowen*, 299 Kan. at 349; see also *State v. Davis*, 283 Kan. 569, 573, 158 P.3d 317 (2007) ("This court reviews a trial court's determination that hearsay is admissible under a statutory exception

60

. . . for an abuse of discretion. '"The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."' [Citations omitted.]"); *State v. Lackey*, 280 Kan. 190, 205, 120 P.3d 332 (2005) ("Relevancy established, an appellate court reviews the district court's decision to admit or exclude hearsay evidence under the abuse of discretion standard of review."), *overruled on other grounds by State v. Davis*, 283 Kan. 569; *State v. Hobson*, 234 Kan. 133, 151-52, 671 P.2d 1365 (1983) (resolution of whether question asked on cross-examination is responsive to testimony given on direct examination "resides in the sound discretion of the trial court [and] will not be disturbed on appeal absent a showing of abuse of the exercise of the power of discretion").

*Analysis*

The State called Detective Shorb during its case-in-chief but did not ask him questions regarding ownership of the Samsung cell phone at that time. The defense then called Detective Shorb as a witness, and during that examination the defense counsel elicited testimony about obtaining search warrants for cell phones and turning them over to the officers that perform phone downloads. Then, during the State's cross-examination, Detective Shorb confirmed without objection that he obtained search warrants for an iPhone, the Samsung phone, and a Huawei cell phone. He also said that he was unable to confirm who the phones belonged to. When the prosecutor asked, "Isn't it true that one of the phones, you found a link to a Thomas Earl Brown, Jr.," defense counsel objected to the question being beyond the scope of direct. The following colloquy then took place:

> "[Prosecutor]: I believe on direct examination he talked about him seizing the phone or having the phone seized to get a search warrant for those. So can I not cross on the phones?
>
> "The Court: Okay.

61

"[Defense Counsel]: He asked him if he found out whose identified to the phones, and he said he doesn't know. He also said that he gave the search warrants to somebody else to do the investigation.

"[Prosecutor]: I understand that. But the scope of the examination is the phones.

"The Court: All right. And I'm going to overrule the objection, based on the objection that it was outside the scope.

"Q. (By [the Prosecutor:]) Isn't it true that you learned one of the phones inside the SUV came back to Thomas Brown, Jr.?

"[Defense Counsel]: Objection; hearsay.

"The Court: Response?

"[Prosecutor]: I'll lay foundation.

"The Court: Okay.

"Q. (By [the Prosecutor:]) Was there any follow-up on attempting to identify the proprietors of those phones?

"A. Throughout the investigation, yes. By me specifically, no.

"Q. Were you made aware of those findings as far as ownership of those phones?

"[Defense Counsel]: Objection; hearsay.

"[Prosecutor]: It's not hearsay.

"The Court: I think that the answer to this question is not hearsay. I will overrule the objection and allow that; 'were you made aware'?

"A. Yes.

"Q. (By [the Prosecutor:]) And how were you made aware?

"A. Information coming from detectives who was involved in the investigation when I was tasked to do another search warrant for DNA.

"Q. And which detectives—well, did any of those detectives provide you with information regarding the ownership of any of those phones?

"A. Yeah, just verbal notification.

"Q. And which detective provided you with verbal information regarding the ownership of any of those phones?

"A. Detective Powell.

"Q. And did you do anything with that information once Detective Powell provided you with who those phones or that phone belonged to?

"A. Yes.

"Q. And what did you do?

"A. I completed another search warrant—or, I'm sorry, a KBI lab request, based on DNA, on their findings of the phone ownership.

"Q. And who did you want the DNA comparison done to—done with?

"[Defense Counsel]: Judge, it's still getting into hearsay. Objection; hearsay. The information he got from the Detective Powell, he has to be given a name to do a search warrant, so he's trying to go around the hearsay and get the answer without that.

63

"[Prosecutor]: I'm simply asking him if he requested DNA analysis, and he said he did, and then I asked him who he was trying to compare it to.

"The Court: I'm going to overrule the objection and allow the question.

"A. A Thomas Earl Brown, Jr."

Lowery argues the prosecutor's questions regarding the search warrant for and ownership of the Samsung cell phone were beyond the scope of direct examination as they were not responsive, material, or relevant to any question on direct. Lowery relies on *Hobson*, where this court stated:

"The law is clear that cross-examination may be permitted into matters which were the subject of the direct examination. *Humphries v. State Highway Commission*, 201 Kan. 544, 547, 442 P.2d 475 (1968). Where a general subject matter has been opened up on direct, cross-examination may go to any phase of the subject matter and is not restricted to identical details developed or specific facts gone into on the direct examination. *State v. Puckett*, 6 Kan. App. 2d 688, 694, 634 P.2d 144 (1981), *aff'd* 230 Kan. 596, 640 P.2d 1198 (1982). Questions asked on cross-examination must be responsive to testimony given on direct examination, or material and relevant thereto . . . ." 234 Kan. at 151.

Lowery does not provide any precedent addressing an analogous circumstance. The State argues that Lowery asked Detective Shorb if he was able to obtain search warrants and what he did with those search warrants. The State asserts that because Lowery asked Detective Shorb about the search warrants for cell phones on direct examination, the prosecutor's questioning was not outside the scope. We agree with the State. The general subject matter of the search warrant for the Samsung cell phone was elicited by the defense on direct examination, thereby making it fair game for the prosecutor to question whether the State was able to link that cell phone to Brown.

64

Lowery next argues that Detective Shorb's testimony about the ownership of the Samsung phone constituted inadmissible hearsay evidence. Under K.S.A. 2017 Supp. 60-460, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible," unless the statement meets an exception to the hearsay rule. Lowery contends that because Detective Shorb only learned who owned the cell phone from another detective, it was hearsay for him to relate the ownership information. Lowery argues that the State could not avoid the hearsay prohibition by bootstrapping the information into evidence through questioning about DNA testing conducted on the phone.

The State has the better argument. Inquiring whose DNA was being targeted in a test of the cell phone is not the same thing as asking who *owns* the phone. The fact that Brown's DNA was on the cell phone that was found in the SUV involved in a homicide would be probative evidence, potentially placing Brown at the scene of the shooting, no matter who might ultimately be determined to be the actual owner of the cell phone.

Further, as the State correctly points out, any error in allowing Detective Shorb to testify regarding the requested DNA analysis was harmless. Under the statutory harmless error standard from K.S.A. 2017 Supp. 60-261, which disregards errors that do not affect the substantial rights of the parties, this court must determine if there is a "'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" *State v. McCullough*, 293 Kan. 970, 981-82, 270 P.3d 1142 (2012) (quoting *Ward*, 292 Kan. at 569). The State, as the party who benefits from the improper admission of evidence under the statute, bears the burden of proof. *McCullough*, 293 Kan. at 983. In the State's rebuttal, Detective Ladd testified about evidence extracted from the iPhone and Samsung phone found in the SUV and, without objection from the defense, described an unrelated text from the Samsung phone which stated, "this T BLK. Call me later." That strong circumstantial evidence that the Samsung cell phone belonged

to or was used by Brown, also known as "T-Black," negated any reasonable probability that the evidence from Detective Shorb affected the outcome of the trial in light of the record as a whole.

SUFFICIENCY OF THE EVIDENCE

Lowery challenges the sufficiency of the evidence to support his convictions for the premeditated first-degree murder of Davenport-Ray, the attempted premeditated first-degree murder of Ray, and the unlawful discharge of a firearm at an occupied dwelling.

*Standard of Review*

"When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 8, 245 P.3d 1030 (2011). Furthermore, this court has recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). 'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.' *McCaslin*, 291 Kan. 697, Syl. ¶ 9." *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015).

*Analysis*

*Murder Convictions*

We begin with the murder convictions. Lowery accurately points out that, under an aiding and abetting theory, the State had to prove that he "intentionally aided and

66

abetted a premeditated first-degree murder. This showing necessarily requires a finding of premeditation on the part of the aider/abettor." *Overstreet*, 288 Kan. at 13; see also *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014) (State required to prove intentional participation in premeditated first-degree murder which "obviously includes the element of premeditation").

But on the other hand, the State was not required to prove that Lowery fired the shots leading to his homicide convictions. In *State v. Betancourt*, 299 Kan. 131, 139, 322 P.3d 353 (2014), we explained:

> "[The aiding and abetting statute] does not establish two different crimes for committing a murder, one committed by firing a gun and the other by driving the getaway car. Instead, the legislative intent, as expressed in the language of the aiding and abetting statute, is to make each individual who engages in a concerted action to carry out a crime equally culpable."

Lowery relies upon *State v. Williams*, 299 Kan. 509, 531, 324 P.3d 1078 (2014) *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016), where this court stated:

> "'[W]ithout other incriminating evidence, mere presence in the vicinity of the crime or mere association with the principals that committed the crime is not sufficient to establish guilt as an aider or abettor. [Citation omitted.]' *State v. Green*, 280 Kan. 758, 761-62, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006). Instead, to establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate that he or she was facilitating the venture's success. The element of intent necessary to obtain a conviction for aiding and abetting may be inferred from circumstantial evidence. *State v. Gant,* 288 Kan. 76, 83, 201 P.3d 673 (2009), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013); *State v. Herron,* 286 Kan. 959, 967, 189 P.3d 1173 (2008); *State v. Goering,* 225 Kan. 755, Syl. ¶ 2, 594 P.2d 194 (1979)."

67

Lowery argues that the only circumstantial evidence of premeditation was Lowery's conduct before the shooting and that conduct was implied using unreliable evidence of the location of Lowery's cell phone. Consequently, the jury was not permitted to infer premeditation based on circumstances that were not proved, but rather were circumstances based upon speculation and conjecture.

Both parties point to the list of factors this court has utilized when reviewing whether the State has proved premeditation, including: "(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013). "[T]he analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. Use of a deadly weapon by itself, however, is insufficient to establish premeditation. [Citations omitted.]" *Kettler*, 299 Kan. at 467.

Beginning with the nature of the weapon used, Lowery engages in some misdirection, arguing that the only weapon recovered from the SUV was the Springfield .45; that the DNA testing on this weapon did not conclusively link it to him; that even assuming DNA testing linked him to the weapon, the shell casings found at the scene were not matched to this weapon; and that the malfunctioning Springfield weapon could not have fired a rapid succession of shots from the SUV. But it was undisputed that Davenport-Ray was killed by rounds discharged from a firearm or multiple firearms. Either Lowery or someone who was a passenger in the SUV Lowery admitted driving at the time used a firearm to commit the homicide crimes.

Turning to the lack of provocation factor, both Ray and Smith testified that nothing they witnessed throughout the evening led them to believe they would later be attacked. Ray said he was unaware of any problems at the wedding, reception, or Elks Lodge. Moreover, Ray testified the shots initiated from the SUV; Smith testified that he did not fire a weapon and did not see anyone else inside the Charger fire a weapon. Of course, Lowery testified that the first shots were fired from the Charger. But that was a credibility issue for the jury to resolve, and "on appeal [this court] accept[s] the circumstantial evidence in the light most favorable to the State when assessing sufficiency." *Ward*, 292 Kan. at 581-82.

The third factor, conduct before and after the killing, provides additional circumstantial evidence against Lowery. The State points out that Lowery drove a rental car from Oklahoma prior to the shooting. The latex gloves found in the SUV and along the escape route, containing DNA which could not exclude Lowery, indicates a preparation to discharge a firearm without transferring the shooter's DNA to the weapon or transferring the weapon's gunpowder or stippling to the shooter. Lowery's iPhone connected with a Samsung phone found in the SUV several times on May 24th and 25th, leading up to the events in question, suggesting that plans were being made.

As noted, Lowery ignores the other circumstantial evidence and contends that the finding of premeditation "obviously boiled down to" the State's evidence regarding the location data from his iPhone. We do not view the location evidence to be dispositive, but it is yet another circumstance for the jury to weigh.

The first location data evidence the State argues supports premeditation involves GPS location data obtained from Lowery accessing apps on his iPhone. Detective Ladd testified this data showed a 70% confidence factor that Lowery's iPhone was located at 1208 Southwest Munson in Topeka, the address of the Faith Temple Church where Ray and Davenport-Ray were married, at 1:15 p.m. on May 24th. Defense counsel argues this

evidence is unreliable and relying upon it as circumstantial evidence of premeditation would require a leap of faith. But the reliability of this information was the subject of cross-examination at trial. For example, during cross-examination, defense counsel pointed out that the next location where the iPhone accessed an app placed Lowery's phone in the middle of Lake Shawnee. Pointedly, Lowery does not challenge the *admissibility* of Detective Ladd's testimony and, without an appellate argument that the district court erred in admitting this evidence, we are left with the question of the weight that it should be given, a question for the jury, not an appellate court.

The other location evidence looked at the cell phone tower sectors utilized by Lowery's iPhone. That evidence purported to establish that Lowery was near the Elks Lodge around 12:30 a.m. Lowery's location prior to the shooting is significant because it implies that Lowery was watching and waiting for Ray and Davenport-Ray to leave the Elks Lodge. Lowery does not attack the premise for which the evidence was offered, but rather he argues that the State's exhibits purporting to demonstrate Lowery's iPhone's location based upon its connection to cell phone tower sectors in the Topeka area did not match the capability of the technology and was misleading. Indeed, Detective Ladd admitted that the iPhone could have been anywhere in a 40 to 60 mile antenna radius and did not have to be located within the blue-shaded areas depicted in the State's exhibits. On the other hand, the detective testified that the phone could not have been located in another sector. Consequently, although the tower sector evidence could not pinpoint Lowery's location as the State asserts, it established that he was utilizing a cell phone tower sector covering the Elks Lodge and not utilizing a cell phone tower sector that covered 8th and Taylor and 8th and Western, where Lowery testified he was located at the time.

But again, the issue before us is not the admissibility of the State's exhibits. The evidence was available to the jury which could assign to it whatever weight it deserved in considering Lowery's location and, in turn, his course of conduct prior to the shooting.

70

Regarding the fourth factor, Lowery is correct that there was no evidence that Lowery threatened Ray or Davenport-Ray before the shooting.

The fifth factor considers lethal blows after the victim was felled and rendered helpless. The State argues that the back to front pattern of gunshots indicates that Lowery and the others did not want to leave to chance that Ray would make it out alive. But Ray was not felled and rendered helpless. In fact, it was Lowery who was felled and rendered unconscious. This factor is inapplicable.

Viewing the evidence in a light most favorable to the State, there was sufficient evidence establishing Lowery's premeditation and intent. Lowery drove the rented SUV from Oklahoma and admitted driving it during the shooting incident. His cell phone shows multiple communications with a cell phone linked to Brown prior to the shooting. Multiple shots were fired from the SUV into the victims' vehicle from multiple angles. The occupants of the SUV came equipped with latex gloves which can be used to conceal identity and avoid gunshot residue. The attack appeared to be unprovoked.

Lowery was "free to argue to the jury that the circumstantial nature of much of the evidence created reasonable doubt, but on appeal [this court] accept[s] the circumstantial evidence in the light most favorable to the State when assessing sufficiency." *Ward*, 292 Kan. at 581-82. Accordingly, we find that the State presented sufficient evidence to support Lowery's convictions for premeditated first-degree murder and attempted premeditated first-degree murder.

*Unlawful Discharge of a Firearm at an Occupied Dwelling*

The district court instructed the jury that in order to convict Lowery of criminal discharge of a firearm, it had to find:  (1) Lowery discharged a firearm at

71

a dwelling; (2) Lowery did so recklessly and without authority; (3) the dwelling was occupied by a human being at the time, whether or not the defendant knew or had reason to know it was occupied; and (4) this act occurred on or about the 25th day of May 2014, in Shawnee County, Kansas. Viewing the evidence in the light most favorable to the State, a house just south of the location of the SUV wreck was struck by gunfire. An occupant of the house testified that she was in the house when she heard gunfire, yelling, and a car crash. A bullet was found inside the house, and there was a bullet hole in the side of the house. There was a direct line from the bullet holes coming from the SUV's passenger side airbag to the bullet hole in the house.

The State argues it was reasonable to infer that Lowery shot a .45 caliber weapon at the Charger and one of the bullets from the weapon ended up near the house occupant's leg as she was on the couch inside her home that night. The evidence supporting that scenario is thin, at best. But the jury was also provided an instruction on aiding and abetting liability and there was sufficient evidence from which the jury could find that one of the vehicle occupants discharged a firearm at the dwelling, recklessly and without authority.

The jury was instructed that the mental state element for this crime was that Lowery acted "recklessly." Accordingly, under K.S.A. 2017 Supp. 21-5210(b), Lowery was "liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended." See *State v. Garza*, 259 Kan. 826, Syl. ¶ 6, 916 P.2d 9 (1996) ("Giving assistance or encouragement to one who it is known will thereby engage in conduct dangerous to life is sufficient for accomplice liability as an aider or abettor as to crimes defined in terms of recklessness or negligence."); see also *State v. Friday*, 297 Kan. 1023, 1041-42, 306 P.3d 265 (2013) (relying on *Garza* to hold no legal error in instructing the jury on aiding and abetting liability for reckless second-

degree murder). Because it was reasonably foreseeable that a house would get struck by a bullet during a rapid-fire drive-by shooting between two moving vehicles in an area containing residences, Lowery's conviction for criminal discharge of a firearm at an occupied dwelling was supported by sufficient evidence.

CUMULATIVE ERROR

For his final issue, Lowery argues that the cumulative effect of the prosecutorial errors and the trial court's legal errors deprived him of his right to a fair trial. His cursory argument is that the evidence of defendant's requisite mental state to support convictions on an aiding and abetting theory "is far from overwhelming," and, thus, the totality of errors committed in this case substantially prejudiced the defendant, so that reversal is required. The State counters with the equally cursory argument that the cumulative error doctrine does not apply because there were no errors, or maybe only one error. But if there were any errors, "their cumulative effect still does not require reversal because Lowery's right to a fair trial was not violated."

We have explained the process as follows:

"'In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?' *State v. Tully,* 293 Kan. 176, 205, 262 P.3d 314 (2011)." *State v. Armstrong*, 299 Kan. 405, 444-45, 324 P.3d 1052 (2014).

*Standard of Review*

> "'When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial.' *State v. Stewart*, 306 Kan. 237, 265, 393 P.3d 1031 (2017). However, 'if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' *State v. Tully*, 293 Kan. 176, Syl. ¶ 18, 262 P.3d 314 (2011)." *Robinson*, 306 Kan. at 1034.

*Analysis*

Contrary to the State's argument, this is not a case in which we are faced with no errors or a single error, which would render the cumulative error doctrine inapplicable. We have identified three instances of prosecutorial error: the prosecutor violated the order in limine and misstated the evidence in arguing Lowery intimidated Yeargin-Charles; the prosecutor made an improper golden rule argument; and the prosecutor misstated and mischaracterized the DNA probabilities. In addition, we found the following trial errors: Lowery's statutory right to be present at the hearing on his motion in limine was violated; and the district court erred in refusing to redact the video recording of Lowery's law enforcement interview to remove references to a 50-year sentence, to remove an officer's explanation of the felony-murder law, and to remove the statements implying that Lowery had previously been in prison. Because we applied the constitutional harmless error standard to the prosecutorial errors, that standard applies to the cumulative error analysis. See *Armstrong*, 299 Kan. at 445.

We have noted that several considerations are relevant when weighing whether errors were cumulatively harmful, including the effectiveness of any remedial efforts by the district court at the time the error arose; the nature and number of errors committed

74

and their interrelationship, if any; and the strength of the evidence. 299 Kan. at 445. We do not discern any remedial action by the district court that would impact this analysis. On the other hand, "[w]e . . . conclude that any prejudice caused by one error did not exacerbate any prejudice caused by another." 299 Kan. at 445. Moreover, we have concluded that the three prosecutorial errors were harmless beyond a reasonable doubt. Further, we do not discern that the fairness of Lowery's trial was impacted by his absence at the motion hearing. Accordingly, while the evidence was not overwhelming, it was circumstantially strong enough to convince us that the cumulative effect of the errors did not deprive Lowery of a fair trial.

Affirmed.